# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEORGE MACIEL,
            *Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
            *Respondent-Appellee.*

No. 04-75716

Tax Ct. No.
7802-00

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
October 19, 2006—San Francisco, California

Filed June 7, 2007

Before: Susan P. Graber, William A. Fletcher, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher

6925

## COUNSEL

David M. Kirsch, San Jose, California, for the petitioner-appellant.

Frank P. Cihlar and Bethany B. Hauser, Tax Division, U.S. Department of Justice, Washington D.C., for the respondent-appellee.

## OPINION

W. FLETCHER, Circuit Judge:

George Maciel appeals from a decision of the United States Tax Court, which upheld an Internal Revenue Service ("IRS") Notice of Deficiency for the 1990, 1991, and 1992 tax years. In a separate proceeding, Maciel pled guilty to criminal tax charges. As part of its sentencing decision in that case, the federal district court found that Maciel had not fraudulently intended to evade the payment of taxes. Maciel contends that, under the doctrine of collateral estoppel, the sentencing court's finding should have precluded relitigation of the fraud issue before the tax court. Further, Maciel contends that, even if relitigation is not precluded, the tax court erred in finding that he acted fraudulently when he failed to report income from a 1990 business sale. Finally, Maciel challenges the tax court's denial of various business deductions. We reject Maciel's preclusion and fraud claims, but we hold that he is entitled to deduct certain bona fide business expenses.

## I. Background

During a routine audit in 1994, the IRS determined that Maciel had significantly understated his income on several tax

returns. The agency referred Maciel's case for criminal prosecution. After initially charging Maciel with two felony counts of tax evasion in violation of 26 U.S.C. § 7201, the government filed a superseding information on September 23, 1998, charging Maciel with two felony counts of willfully filing a false return in violation of 26 U.S.C. § 7206(1). Unlike § 7201, which requires proof that the defendant "willfully attempt[ed] . . . to evade or defeat" the payment of tax, § 7206(1) requires only proof that the defendant "[w]illfully make[ ] and subscribe[ ]" a materially false return. 26 U.S.C. §§ 7201, 7206(1); *see also United States v. Boulware*, 384 F.3d 794, 810 (9th Cir. 2004); *Considine v. United States*, 683 F.2d 1285, 1287 (9th Cir. 1982).

Maciel entered a plea agreement with the government in which he pled guilty to both § 7206(1) counts and admitted signing tax returns he knew to be inaccurate for both the 1991 and 1992 tax years. The plea agreement stated that one of two Sentencing Guidelines calculations would apply. The first provided for a base offense level of ten "if the offense was committed in order to facilitate evasion of a tax." U.S.S.G. §§ 2T1.3(a)(1), 2T4.1 (1992). The second provided for a base offense level of six if "otherwise." *Id*. § 2T1.3(a)(2). In either case, the government agreed to include a two-point reduction for acceptance of responsibility, resulting in an adjusted offense level of either eight or four. The government also agreed to "recommend that any sentence imposed be satisfied by home detention and electronic monitoring."

The presentence report (PSR) subsequently concluded that Maciel had intended to evade taxation and therefore was subject to the higher § 2T1.3(a)(1) sentencing guideline. The PSR, however, determined that Maciel's adjusted offense level was nine, rather than eight as calculated in the plea agreement, because it considered Maciel's conduct not only in 1991 and 1992 — the tax years covered by the plea agreement — but also in 1990. Maciel's total underpayment during those three years increased his offense level by one point.

At his April 13, 1999, sentencing hearing, Maciel urged the district court to reject the PSR's conclusion that he had fraudulently intended to evade taxation or, in the alternative, to consider only the tax losses from 1991 and 1992. The government responded, without significant elaboration, that there appeared to be "some intent on [Maciel's] part to do something." The government, however, agreed with Maciel that, consistent with the plea agreement, Maciel's adjusted offense level should be no higher than eight. Neither Maciel nor the government attempted to call witnesses or introduce evidence on the question of intent to evade. Instead, both sides agreed that "the Court has all the information it needs in order to make the [sentencing] determination."

The district court announced its decision at the conclusion of the sentencing hearing. With respect to Maciel's intent, the court explained:

> I think on balance I am satisfied that the intent here was not primarily to avoid payment of tax. I think the intent may well have been to divert corporate money to personal use which is not a good thing and certainly is not something that the Court should countenance and particularly since it did have a consequence in terms of the accuracy of Mr. Maciel's tax returns.

> But I don't think that the conduct looked at in its totality suggests that the reason Mr. Maciel diverted the money was to avoid paying money to the Internal Revenue Service. I think that's the finding that the Court would have to make. So I think we're looking at the lower of the two calculations.

Based on the government's recommendation, the court sentenced Maciel to three months of home detention. The court also imposed three years of probation, noting that Maciel had not yet "worked out the matters with the IRS." As a special

condition of his probation, Maciel was required to "comply and cooperate with the Internal Revenue Service in a good faith effort to pay any outstanding tax liability including any assessed penalty and interest . . . not limited to the two tax years that are charged in the information."

The IRS informed Maciel of his outstanding liability in a Notice of Deficiency sent on June 13, 2000. According to the IRS, Maciel owed more than $300,000 in back taxes for 1990-92 and nearly $250,000 in civil penalties pursuant to 26 U.S.C. § 6663. Section 6663 imposes penalties when "any part of any underpayment of tax required to be shown on a return is due to fraud."

Maciel took issue with the Commissioner's Notice of Deficiency and petitioned the tax court for a redetermination. He subsequently filed a motion for summary judgment, asserting that the IRS was estopped from relitigating "the issue of fraud or intent to evade tax by factual determination by the District Court at [Maciel's] sentencing hearing and the judgment of the District Court based on those factual determinations." According to Maciel, absent a showing of fraud, the statute of limitations barred the IRS from assessing back taxes for the years at issue. *See* 26 U.S.C. § 6501(a), (c)(2). The tax court denied Maciel's motion without opinion, and a two-day bench trial followed on December 12 and 13, 2001.

In an opinion filed February 4, 2004, the tax court generally affirmed the deficiencies and penalties levied against Maciel. *See Maciel v. Comm'r*, 87 T.C.M. (CCH) 881 (2004), *available at* 2004 WL 205819. The court found "clear and convincing evidence that [Maciel] underpaid his income taxes due and owing for the years at issue," and that he "fraudulently intended to evade the payment of his tax liabilities." 2004 WL 205819, at *15, *7. In support of its fraud finding, the court relied on the collective weight of a number of factors. For example, Maciel regularly commingled funds among his various businesses, engaged in large unexplained cash

transactions, mislabeled certain transactions as loans, failed to report any earnings from certain unincorporated business ventures, failed to keep adequate business records, and failed to inform his accountants and bookkeeper of his activities. *Id.* at *16-17.

## II.   Preclusion

**[1]** Maciel maintains that the doctrine of collateral estoppel (issue preclusion) required the tax court to adopt the finding of the district court at Maciel's criminal sentencing hearing that Maciel did not intend to evade taxation. We consider de novo the availability of collateral estoppel. *See Littlejohn v. United States*, 321 F.3d 915, 919 (9th Cir. 2003). This circuit has not expressly decided whether, or under what circumstances, the parties to a civil suit should be bound by findings previously made at a criminal sentencing hearing. Following the Second Circuit, we now hold that it is presumptively improper for a court to give preclusive effect to the findings of a sentencing court during subsequent civil litigation.

**[2]** The doctrine of collateral estoppel promotes judicial economy and protects parties from the burden of successive litigation by barring the relitigation of issues in certain circumstances. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). For example, when an issue is "actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding," a court's decision is binding in a subsequent action between the parties (or those in privity with the parties). *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995); *see also* Restatement (Second) of Judgments § 27 (1982). The key question in this case is whether the parties had "a full and fair opportunity to litigate the merits of [the fraud] issue" during the sentencing hearing. *Littlejohn*, 321 F.3d at 923; *see also Allen v. McCurry*, 449 U.S. 90, 95 (1980) (noting that "the Court has repeatedly recognized . . . that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not

have a 'full and fair opportunity' to litigate [an] issue in the earlier case").

**[3]** In deciding whether an opportunity to litigate is "full and fair," a court must make a practical judgment based on at least two considerations. First, the court must compare the procedures in the prior and subsequent actions. If "procedural opportunities unavailable in the first action . . . could readily cause a different result" in the second action, then the results of the first action generally should not be given preclusive effect. *Parklane Hosiery*, 439 U.S. at 331 & n.15; *see also Montana v. United States*, 440 U.S. 147, 164 n.11 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."). Second, the court must consider the parties' incentives to litigate in the two actions. If a party had good reason not to contest an issue vigorously during the first action and did not, in fact, vigorously contest the issue, that party generally should be entitled to relitigate the issue during the second action. *See* 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4423, at 612 (2d ed. 2002) ("The most general independent concern reflected in the limitation of issue preclusion by the full and fair opportunity requirement goes to the incentive to litigate vigorously in the first action."); *see also Parklane Hosiery*, 439 U.S. at 330 (noting that incentive problems sometimes arise when the second action was not reasonably foreseeable at the time of the first action).

**[4]** We agree with the Second Circuit that findings made in a criminal sentencing proceeding ordinarily should not have preclusive effect in a subsequent civil case. In *SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999), the Second Circuit rejected the SEC's attempt to preclude a civil defendant from relitigating a sentencing judge's finding that the defendant had committed securities fraud. In a prior criminal trial, the defendant had been convicted on obstruction of justice charges but had been acquitted on charges related to

securities fraud. The sentencing judge nevertheless concluded, following "extensive" post-trial litigation, that the defendant was subject to a sentencing enhancement because he "had committed securities fraud 'by at least a preponderance of the evidence.' " *Id.* at 299-300. The Second Circuit observed that "a plenary civil trial affords a defendant procedural opportunities that are unavailable at sentencing and that could command a different result." *Id.* at 305. For example, "[u]nlike a civil litigant, a criminal defendant's opportunities to take discovery may be limited for sentencing purposes." *Id.* The court also noted that "the incentive to litigate a sentencing finding is frequently less intense, and certainly more fraught with risk, than it would be for a full-blown civil trial." *Id.*

The Second Circuit has not confined *Monarch*'s reasoning to situations in which the government seeks to apply a favorable sentencing decision in subsequent civil litigation. In *United States v. U.S. Currency in the Amount of $119,984*, 304 F.3d 165 (2d Cir. 2002), that court rejected a former criminal defendant's attempt to invoke collateral estoppel against the government. The court held that the U.S. Customs Service could pursue a civil forfeiture action despite a sentencing judge's previous finding that the currency at issue had been lawfully obtained. *Id.* at 168-70. According to the court, the government had not had "a sufficiently 'fair' opportunity to litigate the relevant issues" because "procedural mechanisms crucial to the Government's ability to gather probative evidence in the civil forfeiture action were either not available, or were available to a lesser degree, in the sentencing proceedings." *Id.* at 176. The government, for example, had not "ha[d] recourse [at sentencing] to the full array of civil discovery procedures" and could not have compelled the defendant to testify. *Id.* at 177. The court did note, however, that the government in that case had an adequate incentive to litigate "in order to ensure that [the defendant] received punishment commensurate to his offense." *Id.* at 176.

The decisions in *Monarch* and *$119,984* considered efficiency as well as fairness. The Second Circuit concluded that

giving preclusive effect to sentencing findings would be unlikely to produce meaningful judicial economy benefits. Indeed, the opposite might well be true. Anticipating the possibility of preclusion in future civil litigation, parties would have an incentive to conduct lengthy mini-trials on tangential issues, producing "sentencing proceedings of mushrooming complexity" and delaying the resolution of criminal cases. *Monarch*, 192 F.3d at 306; *see also $119,984*, 304 F.3d at 174; 18 Wright et al. § 4423, at 613 ("Even if later claims involving the same issues are foreseeable, it may not be wise to augment the stakes of the first litigation.").

The Second Circuit's approach is entirely consistent with this circuit's decision in *Allen v. City of Los Angeles*, 92 F.3d 842 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997) (en banc). Maciel relies on *Allen* to support his position that sentencing findings should have collateral estoppel effect, but we disagree with his view of that case. In *Allen*, we considered whether the criminal conviction of police officers involved in the beating of Rodney King precluded the defendants in a subsequent civil suit from arguing that the officers had acted without "actual malice." We concluded that the criminal jury's verdict necessarily meant that the jury had found actual malice. We remarked that "the district court's sentencing opinion add[ed] additional support to the criminal jury findings" and held that "both the criminal verdict and the sentencing opinion are a basis for collateral estoppel on the issue." *Id.* at 850. If these statements are read in context, it is clear that we did not mean that the sentencing decision alone would have justified preclusion absent the jury's corroborating finding of actual malice. At most, *Allen*, like *Monarch* and *$119,984*, indicates that a sentencing finding *may* be entitled to collateral estoppel effect in subsequent civil litigation when fairness and efficiency considerations support preclusion.

**[5]** In this case, we conclude that Maciel has failed to overcome the presumption against giving collateral estoppel effect

to a sentencing finding. Maciel's argument that the government was not, in fact, prejudiced by the procedural differences in the sentencing and civil contexts is unpersuasive. The parties understood that the criminal and civil actions against Maciel were proceeding on separate tracks, with the Department of Justice spearheading the criminal prosecution and the IRS determining Maciel's civil liability. Both Maciel and the government recognized that the IRS would have an opportunity after the criminal proceedings concluded to investigate Maciel's conduct and assess civil penalties. In his plea agreement, Maciel expressly agreed to pay "all taxes . . . and penalties that may be due, as finally determined by an Internal Revenue Service audit process and any administrative or judicial process." During the sentencing hearing itself, Maciel's counsel acknowledged that the issue of Maciel's outstanding tax liability and penalties remained "pending on the civil level."

**[6]** Moreover, it is apparent that the government had virtually no incentive to litigate the fraud issue at sentencing. In some cases, the government's obligation to seek a sentence consonant with a criminal defendant's culpability will be incentive enough to ensure that relevant issues are litigated vigorously. *See $119,984*, 304 F.3d at 176 (noting that the government's "desire to impose appropriate punishment" on a criminal defendant should be "at least as great" as its desire to add funds to the U.S. Treasury (internal quotation marks omitted)). In this case, however, the government's incentive to prove fraud was minimal. The plea agreement provided that Maciel was subject either to an adjusted offense level of four (the applicable level without a showing of fraud) or eight (the applicable level with a showing of fraud). *See* U.S.S.G. § 2T1.3 (1992). Under the Guidelines, an offense level of eight would have subjected Maciel to a longer sentence than an offense level of four only if Maciel's criminal history category was II or more. Because the PSR placed Maciel in criminal history category I, both offense levels produced the same sentencing range of 0-6 months.

**[7]** Maciel contends that the situation is somewhat more complicated because the PSR, after concluding that Maciel committed fraud and including his 1990 underpayment in its "tax loss" calculation, ultimately recommended an adjusted offense level of nine rather than eight, resulting in a sentencing range of 4-10 months rather than 0-6 months. In Maciel's view, the PSR's calculation gave the government an adequate incentive to litigate the fraud issue since a finding of fraud would have subjected Maciel to a lengthier sentence. The government, however, properly recognized that pressing for a longer sentence would have been inconsistent with the terms of the plea agreement. Had the government strenuously argued that Maciel had acted fraudulently, knowing that a finding of fraud could have subjected Maciel to an adjusted offense level of nine, Maciel legitimately could have cried foul. Under these circumstances, giving preclusive effect to the sentencing court's finding would effectively punish the government for honoring its plea agreement. We decline to endorse such a counterintuitive result.

## III.   Omission of Income from Sale of M&V Investments

Maciel insists that even if it was proper for the tax court to allow relitigation of the fraud issue, the court erred when it found fraud in his failure to report income from the sale of one of his business enterprises, M&V Investments. Maciel and a partner, Peter Viviano, formed M&V Investments in 1987. Shortly thereafter, M&V Investments acquired two businesses: a corporation named Newark Wreckers, Inc., which was purchased for $50,000 cash, and an unincorporated business named Tri-City Truck Parts, which was purchased for $150,000 cash plus a $200,000 note. In 1990, Maciel sold his 50% stake in M&V Investments to Viviano, apparently after the two men had a falling out. The price was $200,000, which Maciel received from Viviano in the form of three cashier's checks for $100,000, $75,000, and $25,000. As part of the sale agreement, Viviano discharged Maciel from his obligation to repay the outstanding note.

Maciel failed to report income from the M&V Investments sale on his 1990 income tax return. However, Maciel's accountant attached the following statement to Schedule K-1 of the return:

> The above named taxpayer was involved in a partnership for part of the 1990 tax year. The partnership was Tri-City Truck Parts. The taxpayer did not receive his Schedule K-1 (share of partnership income & deductions) for 1990. Several attempts were made to reach the designated partner of Tri-City Truck Parts (Peter Viviano). All attempts were uns[u]ccessful. As a result the above named taxpayer was unable to report his share of the partnership's activity for the 1990 tax year.

According to Maciel, this disclosure statement provides clear proof that he did not commit fraud with respect to his income from the sale of M&V Investments.

[8] We have defined tax fraud as " 'intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing.' " *Estate of Trompeter v. Comm'r*, 279 F.3d 767, 773 (9th Cir. 2002) (quoting *Conforte v. Comm'r*, 692 F.2d 587, 592 (9th Cir. 1982)). In a civil tax case, the Commissioner of Internal Revenue bears the burden of proving fraud by clear and convincing evidence. *See Bradford v. Comm'r*, 796 F.2d 303, 307 (9th Cir. 1986). The existence of fraud need not be shown by direct evidence; instead, a court may infer fraud from "the existence of certain 'badges of fraud.' " *Estate of Trompeter*, 279 F.3d at 773; *see also Bradford*, 796 F.2d at 307. By statute, once the Commissioner "establishes that any portion of an underpayment [in a given year] is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud." 26 U.S.C. § 6663(b).

**[9]** To the extent Maciel challenges the tax court's interpretation of the law, our review is de novo. Specifically, we review de novo Maciel's contention that a taxpayer who discloses information about an omitted item of income cannot be found to have acted fraudulently as a matter of law. Maciel relies principally on the Eighth Circuit's decision in *Benderoff v. United States*, 398 F.2d 132, 137 (8th Cir. 1968). *Benderoff*, however, merely held that the IRS could not collect taxes beyond the usual statute of limitations when the taxpayer's failure to report an item of income was apparent "on the face of the return." *Id.* at 136 (internal quotation marks omitted). *Benderoff* did not involve allegations of fraud, and we decline Maciel's invitation to extend *Benderoff*'s reasoning to this case. The fact that a taxpayer provides the IRS with a hint about omitted income does not automatically preclude a court from finding that the taxpayer acted with an intent to evade taxes. To hold otherwise would encourage unscrupulous taxpayers and their agents to make partial or opaque disclosures designed to avoid taxation without risking fraud penalties. This is the sort of conduct we sought to prevent in *Estate of Trompeter*. In that case, we "reject[ed] the [taxpayer's] suggestion that blind reliance on an accountant's valuation is sufficient *per se* to avoid fraud" based on our concern that "experts for hire would serve as an ironclad defense in tax fraud cases." *Estate of Trompeter*, 279 F.3d at 774.

Because Maciel's disclosure did not preclude a finding of fraud as a matter of law, we review for clear error the tax court's factual determination that Maciel intended to evade taxation. *See, e.g.*, *id.* at 770 ("We review the Tax Court's factual determinations, including . . . findings regarding fraudulent behavior, for clear error."). Under the clear error standard, we will reverse the tax court only when we are "left with the definite and firm conviction that there was no clear and convincing evidence of fraud." *Akland v. Comm'r*, 767 F.2d 618, 621 (9th Cir. 1985) (citation omitted); *see also Bradford*, 796 F.2d at 307. We find no clear error here.

**[10]** As the tax court noted, Maciel's disclosure statement was "at the very least vague and ill-informing." *Maciel*, 2004 WL 205819, at *17 n.53. Significantly, the statement does not mention M&V Investments or Newark Wreckers by name, nor does it explain that Maciel sold his partnership share during the tax year and earned a profit on the transaction. Maciel asserts that the IRS could have inferred the existence of a sale from his declaration that he "was involved in a partnership *for part of* the tax year." (Emphasis added.) That passage, however, does not necessarily indicate an income-generating sale; it could simply mean that Maciel had relinquished his partnership interest or that the partnership had dissolved. Although Maciel's accountant testified that he intended to give the IRS notice of the sale, the tax court was not required to credit that testimony, particularly given the existence of other indicia of fraud. For example, as the tax court noted, Maciel never amended his return to report the sale of M&V Investments. Moreover, the tax court was entitled to evaluate Maciel's intent with respect to the M&V Investments sale in light of Maciel's " '[c]onsistent, substantial understatements of income for several years.' " *Baumgardner v. Comm'r*, 251 F.2d 311, 322 (9th Cir. 1957) (quoting *Kurnick v. Comm'r*, 232 F.2d 678, 681 (6th Cir. 1956) (per curiam)). In sum, given the evidence before the tax court, it was reasonable for the court to conclude that Maciel acted fraudulently when he failed to report income from the sale of M&V Investments.

## IV.   Deductions for Newark T&B and Alviso Racing

Finally, Maciel contends that the tax court erred when it refused to permit deductions associated with two of Maciel's unincorporated businesses, Newark Truck and Body ("Newark T&B") and Alviso Rock/HK Racing ("Alviso Racing"). Maciel did not report any income from these businesses for the 1990-92 tax years. He claims that, in calculating his taxable income and tax liability from these business activities, the tax court should have offset certain bona fide expenses. With respect to Newark T&B, Maciel seeks a depreciation

deduction of $3,813 per year and a deduction of $2,621.43 for utilities expenses incurred in 1992. With respect to Alviso Racing, Maciel seeks to deduct $17,847.23 of expenses for 1990, $15,065.23 for 1991, and $30,283.07 for 1992.

It is the taxpayer's burden to substantiate claimed deductions. *See Boyd Gaming Corp. v. Comm'r*, 177 F.3d 1096, 1098 (9th Cir. 1999); *Rapp v. Comm'r*, 774 F.2d 932, 935 (9th Cir. 1985); *see also* 26 U.S.C. § 274(d). We review for clear error the tax court's factual determination that a taxpayer has failed to produce sufficient evidence to support a deduction. *See Schachter v. Comm'r*, 255 F.3d 1031, 1033 (9th Cir. 2001); *Boyd Gaming Corp.*, 177 F.3d at 1098. The tax court, however, "is obligated to detail its reasoning." *Estate of Trompeter*, 279 F.3d at 770. We hold that it was clearly erroneous for the tax court to deny some, though not all, of the claimed deductions at issue here.

It is undisputed that Newark T&B conducted its business at a property that Maciel purchased in 1990 for $200,000. According to Maciel's documentary evidence, when the County of Alameda assessed this property, it allocated $80,900 of the purchase price to land and the remaining $119,100 to "improvements" (i.e., the buildings out of which Newark T&B operated). Maciel also provided evidence of his closing costs. Because the land itself is not depreciable, Maciel's total depreciable basis in the property—consisting of improvements and a portion of the closing costs—was $120,121. Using the applicable straight-line method for depreciating real property over a useful life of 31.5 years, Maciel calculated depreciation deductions of approximately $3,800 per year. *See* 26 U.S.C. §§ 167-168 (1992). The record indicates that Maciel did not claim these depreciation deductions in his 1990-92 personal or corporate income tax returns.

[11] The tax court's opinion does not expressly consider Maciel's depreciation-related documents. Instead, the tax court's analysis of the issue consists of a single line in a foot-

note: "[T]here is insufficient evidence in the record with which we can calculate any depreciation to which [Maciel] might be entitled." *Maciel*, 2004 WL 205819, at *12 n.42. Given the uncontroverted documentary evidence establishing Maciel's depreciable basis in the property, and given the conclusory nature of the tax court's reasoning, we conclude that it was clear error to deny a depreciation deduction for Newark T&B. Although Maciel is entitled to the full amount of this deduction for 1991 and 1992, his deduction for 1990 must be prorated because the property was not purchased until May of that year.

**[12]** Maciel points to similar documentary evidence of his 1992 utility expenses for Newark T&B. The problem here, however, is that the record does not exclude the possibility that Maciel has already claimed these deductions. Because Maciel had commingled the assets of his businesses and failed to respect corporate formalities, the tax court was rightly concerned that Maciel had included Newark T&B's utility expenses on another return. *See id.* at *12. The 1992 corporate tax return for Alviso Rock, Inc., and George Maciel Trucking, Inc., deducts more than $50,000 in utilities expenses. These expenses are not itemized by type or location. Consequently, the tax court did not clearly err when it denied the deduction for Newark T&B's utilities expenses.

**[13]** With respect to Alviso Racing, Maciel offers a number of account statements, invoices, and bank records to establish his deductible expenses. The documents show, for example, that Maciel regularly purchased racing equipment from Kaeding Performance, Inc., as well as from Shaver Specialty, Inc., a supplier of racing engines. The tax court concluded that it was "unable to determine whether the expenses detailed in the invoices were for the benefit of petitioner's racing business or for one of his related businesses." *Id.* at *13. The court noted that most of the invoices were made out to "Alviso," which could have referred to Maciel's trucking corporation, Alviso Rock, Inc., rather than to Maciel's racing business. *Id.* at *13

n.44. It is clear, however, that Maciel was purchasing racing equipment rather than trucking equipment and that Maciel paid for the equipment using checks drawn on Maciel's "Alviso Rock/HK Racing" bank account. Furthermore, there is no indication that Maciel deducted these expenses on his corporate tax returns. We therefore conclude that the tax court clearly erred when it denied Maciel's claimed deductions for Alviso Racing.

## Conclusion

We hold that the tax court properly refused to give preclusive effect to the sentencing court's fraud finding, and we affirm on the merits the tax court's determination that Maciel acted fraudulently when he failed to report income from the sale of M&V Investments. We reverse the tax court's finding that Maciel was not entitled to deductions for depreciation and for expenses associated with his racing business. The Commissioner is directed to permit those deductions and to adjust Maciel's total liability accordingly.

**AFFIRMED** in part; **REVERSED** in part. Each side to bear its own costs.