**CHIN HUI HOOD, Plaintiff,**

v.

**JEJE ENTERPRISES, INC. and Joseph Lee, Defendants.**

**CIVIL ACTION NO. 1:14-CV-2405-AT**

United States District Court, N.D. Georgia, Atlanta Division.

Signed September 12, 2016

Charles Ronald Bridgers, Lead Attorney, Kevin D. Fitzpatrick, Jr., Lead Attorney, Matthew Wilson Herrington, DeLong Caldwell Bridgers & Fitzpatrick, LLC, Atlanta, GA, for Plaintiff.

Douglass-Duc Duy Nguyen, Quynh-Nga Thi Tran, Nguyen Tran Law Firm, LLC, Lilburn, GA, for Defendants.

## ORDER

Amy Totenberg, United States District Judge

This matter is before the Court on Defendants JeJe Enterprises, Inc. ("JeJe") and Joseph Lee's ("Lee") Motion for Summary Judgment [Doc. 48]. Plaintiff Chin Hui Hood ("Hood"), a former employee at Defendants' store, Mix 5, brought this case under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, seeking to recover unpaid overtime compensation, liquidated damages, and attorney's fees. Plaintiff also seeks civil damages for incorrect tax information filings under 26 U.S.C. § 7434 (2012).

Defendants seek summary judgment on the grounds that the undisputed material facts show that Plaintiff was properly classified as an executive employee, exempt under 29 U.S.C. § 213(a)(1) from the FLSA's overtime requirements. Plaintiff raises two issues in response: first, although she held the position of store manager at Mix 5, a material question of fact exists regarding whether her "primary duty" was managerial; and second, Plaintiff argues she was not "genuinely salaried" so as to qualify for the executive exemption regardless of the outcome of the primary duty analysis.

Defendants also moved for summary judgment on Plaintiff's tax fraud claim under 26 U.S.C. § 7434(a) (2012), arguing that it did not willfully file fraudulent returns with respect to payments made to Plaintiff and that any damage to Plaintiff was not proximately caused by its actions. Plaintiff responds that summary judgment is inappropriate on this claim as well because she was in fact damaged and sufficient circumstantial evidence shows that JeJe knew what it was doing when it issued Internal Revenue Service ("IRS") Form 1099-MISCs to its Korean-speaking managers only for amounts paid by check only.

For the reasons explained below, the Court finds that genuine issues of material fact exist regarding whether Plaintiff was an executive employee exempt from the FLSA's overtime requirement, as well as whether JeJe willfully issued fraudulent tax returns thereby damaging Plaintiff. Accordingly, Defendants' Motion for Summary Judgment [Doc. 48] is **DENIED**.

## I. BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant, the Court provides the following factual description. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007). This summary description does not represent actual findings of fact.

Plaintiff Chin Hui Hood was hired by Defendant JeJe around June 2011. (Plain-

tiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp. DSMF") ¶ 3, Doc. 51-2.)[1] JeJe had advertised an opening for a store manager for its retail clothing store, Mix 5, and Ms. Hood responded and got the job. (*Id.* ¶¶ 2-3.) Plaintiff worked as a store manager of Mix 5 during her entire employment with JeJe, from June 2011 to July 19, 2014. (*Id.* ¶ 4.)

Defendant Joseph Lee is the Chief Executive Officer of JeJe. (Declaration of Joseph Lee ("Lee Decl.") ¶¶ 3, 6, Doc. 48-15.) His wife, Monica Lee, assists in JeJe's management. (Deposition of Chin Hui Hood ("Hood Dep.") at 52, 61-63, 73, 103, 124, 127, 143, Doc. 48-6.) Defendant Lee's brother, Jason Lee, and sister-in-law, Jinhee Lee, also help out in the business. (Lee Decl. ¶ 7.)

During the first three to four months of Plaintiff's employment, Hood worked six days per week. (*Id.* ¶ 5.) After that, her schedule was reduced to five days per week. (*Id.* ¶ 6.) After her schedule was reduced, she regularly reported to the store before 10:00 AM and left after 9:00 PM. (Defendants' Response to Plaintiff's Statement of Additional Material Facts ("Defs.' Resp. PSAMF") ¶ 1, Doc. 52-1.) During holiday seasons, Plaintiff worked approximately from 8:00 AM to 9:00 PM, six days per week. (*Id.* ¶ 2.)

Resolving all factual disputes in Plaintiff's favor, her weekly compensation was reduced by 20 percent each time she was absent for a full day of work, including when that absence was due to illness. Such reductions based on illness absences occurred on several occasions. (Second Declaration of Chin Hui Hood ("2d Hood Decl.") ¶¶ 14-15, Doc. 51-1.) Her weekly compensation was also reduced on multiple occasions when "the store was closed for a full day because of inclement weather," (*id.* ¶ 8), and when the store was closed for partial days, "once due to inclement weather and once due to a fire in a nearby building." (*Id.* ¶ 11.) Plaintiff offers evidence that "JeJe did not maintain a sick leave plan or policy that provided compensation to make up for loss of salary due to illness or injury." (*Id.* ¶ 13.) Defendants offer evidence that they "adjust[ed] the schedule so that she could use her off days" if she had to miss work, though it is unclear if this schedule adjusting practice applied to sick leave as well as to personal leave. (JeJe 30(b)(6) Dep. at 93:15-17.)

Similar to other managers at JeJe Enterprises, Plaintiff's weekly compensation ranged from $700 to $820. (Pl.'s Resp DSMF ¶¶ 9-10.) Plaintiff was paid on a bi-weekly basis, usually half by check and half in cash. (*Id.* ¶ 12.) Sometimes the cash amount exceeded the check amount and vice-versa, and sometimes all of Plaintiff's compensation came in cash. (*Id.* ¶¶ 12-13.) She did not expect her pay to be reduced when she went from working six days per week to working five. (Hood Dep. at 158:16-19.) Ms. Hood never requested a pay advance and never received one. (2d Hood Decl. ¶ 25.) To be clear, Plaintiff initially thought she was being hired for a salaried position, but, according to her, Defendants "didn't perform that way." (Hood Dep. at 162:10-11.) Plaintiff also received bonuses that totaled around $2000.00 each year and which were paid entirely in cash. (*Id.* at 151:1-4; JeJe 30(b)(6) Dep. at 95:15-21.)

---

1. Some of the following statements are copy-and-pasted from Plaintiff's Response to Defendants' Statement of Material Facts admitting the facts asserted in Defendants' Statement. When they are, the Court always cites to Plaintiff's Response to Defendants' Statement but may not use quotation marks. However, when the Court quotes directly from a primary evidentiary source, *e.g.*, a deposition or declaration, the Court always uses quotation marks.

Plaintiff Hood collected and reviewed most of the job applications and resumes submitted to Mix 5. (Pl.'s Resp DSMF ¶ 25.) She also sought out new employees to work at Mix 5. (*Id.* ¶ 27.) Ms. Hood selected candidates to interview, conducted most of those interviews, and made suggestions to Defendant Lee as to whom he should hire. (*Id.* ¶¶ 26, 28-29; Defs.' Resp. PSAMF ¶ 16.) She herself did not hire or fire employees. (Defs.' Resp. PSAMF ¶ 16.)

Plaintiff was responsible for instructing new employees to complete their new-hire on-boarding forms, and she was also responsible for transmitting those forms to JeJe's headquarters. (Pl.'s Resp DSMF ¶ 30.) Once the employee was hired by Defendant Lee, construing the facts in the light most favorable to the non-movant, Plaintiff had no ongoing authority to determine employee pay or give raises or demotions. (First Declaration of Chin Hui Hood ("1st Hood Decl.") ¶ 15, Doc. 14-1; 2d Hood Decl. ¶ 24.) Plaintiff was once authorized by Lee to lessen a particular sales associate's hours at Plaintiff's discretion, and Plaintiff once suggested another sales associate should be considered for a raise. (Hood Dep. at 103:3-17, 137:16-138:22; Pl.'s Resp. DSMF ¶ 33.)

Plaintiff did, however, regularly prepare work schedules for the sales associates, and she reported associates' hours on a bi-weekly basis to Defendant Lee for payroll purposes. (Pl.'s Resp. DSMF ¶¶ 34-35.) Unlike the hourly sales associates at Mix 5, Plaintiff had a set schedule and was not required to report her hours or keep track of them. (*Id.* ¶ 17.) From 2011 through 2013, there were regularly more than three employees who worked a total of at least 80 aggregate hours at Mix 5. (*Id.* ¶¶ 39-41.) In 2014, there were regularly four to six employees who worked a total of at least 80 aggregate hours at Mix 5. (*Id.* ¶ 42.)

With regard to Plaintiff's management of these sales associates, Plaintiff generally:

1. Monitored them to make sure they arrived on time, performed their duties, and complied with employee policies;

2. Instructed them to assist her with fulfilling requests from headquarters concerning store displays, discounts, and the movement of merchandise between stores; and

3. Directed and planned associates' daily tasks, including assigning them to different areas of the store. (*Id.* ¶¶ 45-47, 49.)

The sales associates were required to obtain Plaintiff's permission to take breaks, make merchandise exchanges, issue store credit, and allow discretionary accounts. (*Id.* ¶¶ 48, 51.) Plaintiff was authorized to reprimand sales associates if they exceeded their break time, arrived late for work, or failed to follow employee policies. (*Id.* ¶ 50.)

If the sales associates wanted to switch their schedules or notify Mix 5 that they would not be in to work on a day they were scheduled to work, they would contact the manager on duty or call Jason or Jinhee Lee. (Hood Dep. at 96.) They also might send Plaintiff a text message to that effect. (*Id.*) If sales associates were curious whether Mix 5 would be open during potentially inclement weather, they might contact Plaintiff or the mall office. (*Id.* at 96:18-21.)

With regard to merchandise, all orders placed with outside vendors were done by Monica Lee. Plaintiff did not place orders when inventory and supplies were low. (1st Hood Decl. ¶ 13.) Monica and Defendant Joseph Lee could tell by viewing the store's computer system which items were selling and which items were needed in Plaintiff's Mix 5 store. (Hood Dep. at 126.)

When Plaintiff was chatting with the Lees on the phone, she also told them which items were popular and which items, sizes, and colors were needed at the store. (*Id.*) She also sent Joseph Lee a text message approximately once per month about inventory on which the store was running low. All decisions related to inventory were made by the Lees, though, and items were either brought from headquarters or ordered from an outside vendor without Plaintiff's involvement. (*Id.* at 126-127; 2d Hood Decl. ¶ 28.)

Merchandise was delivered to Mix 5 on a weekly basis. (2d Hood Decl. ¶ 20.) Plaintiff and other sales associates would check the store's computer system to see what merchandise the Lees had ordered so they could prepare for the items' arrival. (*Id.* ¶ 20.) As for the computer system, Plaintiff had Level 10 access to it whereas sales associates only had Level 1 or 2 access. (Lee Decl. ¶ 13.) On Plaintiff's days off, Jason and Jinhee Lee worked in the store and frequently re-arranged inventory without speaking to Plaintiff. (2d Hood Decl. ¶ 18.) And even when Plaintiff was on duty, either Joseph or Jason Lee came to the store on two or three occasions every week. (*Id.* ¶ 21.)

Monica Lee also came to Mix 5 around once per month and reorganized the store with her sister-in-law, Jinhee. (Hood Dep. at 124:5-25.) Monica and Jinhee set up the store displays, and no other employees helped. (*Id.*) Plaintiff did move inventory from the back of the store to the floor at Defendant Lee's request, though, and Plaintiff dressed mannequins and set up window displays based on photos sent to her by Jinhee. Plaintiff sometimes directed sales associates to dress the mannequins with her. (*Id.* at 123:1-15.) Plaintiff did not have authority to remove or discount items that were not selling, but she did have the authority to give a ten percent discount for

damaged inventory. (2d Hood Decl. ¶¶ 26, 29.)

As for security at the Mix 5, Plaintiff contends that her security responsibilities were essentially the same as those of the sales associates: "we were always on the lookout for counterfeit currency and shoplifters; monitoring the fitting rooms on a regular basis; and verifying that price tags had not been switched." (2d Hood. Decl. ¶ 19; Defs.' Resp. PSAMF ¶ 25.) She also testified that "as far as the security is concerned, while I'm working I take care of those matters, yes." (Hood Dep. at 167:1-2.) During her time at Mix 5, Plaintiff handled several theft incidences and at least one incidence each of counterfeit money and switched price tags. (*Id.* at 113-117.) She also served as a witness in a theft incident. (Pl.'s Resp. DSMF ¶ 62.) She could view the store's security camera footage, too. (Defs.' Resp. PSAMF ¶ 20.)

While a theft was in progress, whoever was closest to the cash register would contact mall security. (Hood Dep. at 113-116.) If there was a robbery or some other incident at the store when Plaintiff was not working, Jason Lee would normally leave Plaintiff a note but sometimes sent her a text message. (*Id.* at 107:19-108:11.) According to Plaintiff, she did not have to worry about her work on her days off, though, including security issues. (*Id.* at 108:5-7.)

Plaintiff Hood performed many duties that were routinely done by sales associates. These duties included opening the store, cleaning, maintaining the fitting rooms, organizing the inventory, folding clothes, placing price and security tags on the merchandise, operating the cash register to make transactions, and handling customer issues. (Pl.'s Resp. DSMF ¶ 63.) She remained responsible for employee supervision while performing these tasks. (*Id.* ¶ 64.)

Plaintiff Hood estimates that her "managerial tasks (e.g., opening the store, instructing sales associates, scheduling sales associates, interviewing prospective employees, closing the store, etc.) took up no more than 30 minutes of a more than eleven hour work day. The rest of [her] time was spent doing the same work as performed by the hourly paid sales associates." (2d Hood Decl. ¶ 2.)

Unlike the hourly associates, Plaintiff Hood did not have a constant supervisor at Mix 5, she was not required to clock in and out, she was not reprimanded for arriving at work late, and she was not required to obtain permission before taking a break. (Pl.'s Resp. DSMF ¶¶ 73-76.) She did communicate with and receive direction from the Lees on a daily basis, though. (Hood Dep., Exhibit 9 at 6, Doc. 48-12; Defs.' Resp. PSAMF ¶¶ 45-49.) Plaintiff Hood used her cell phone while on the job, too, and made personal calls from the store phone, while sales associates were prohibited from doing either. (Id. ¶ 78.) Plaintiff was also eligible for performance-based bonuses, whereas sales associates were not. (Id. ¶ 84.)

As described above, Plaintiff was paid on a bi-weekly basis, usually half by check and half in cash. (Id. ¶ 12.) Sometimes the cash amount exceeded the check amount and vice-versa, and sometimes all of Plaintiff's compensation came in cash. (Id. ¶¶ 12-13.) All of Plaintiff's bonuses were in cash. (Id. ¶ 89.)

Plaintiff was issued an IRS Form 1099-MISC for 2011, 2012, and 2013. (Id. ¶ 90.) Plaintiff contends she was issued a 1099 for 2014 as well, (2d Hood Decl. ¶ 34), yet in response to a prior request for admission, she admitted she received a Form W-2 in 2014. (Hood Dep., Exhibit 10 at 26, Doc. 48-13.) JeJe contends it did not know the difference between a 1099 and a W-2, but Plaintiff contends that JeJe must have known the difference because it issued W-2s to all hourly sales associates and 1099s to all of its managers. (Pl.'s Resp. DSMF ¶¶ 91-92; 2d Hood Decl. ¶ 7.)[2] Like Defendant Lee, all of JeJe's managers spoke Korean, while the sales associates did not.

JeJe issued 1099s to Plaintiff for only the amounts it paid her by check. (2d Hood Decl. ¶ 7.) Plaintiff did not complain about receiving half of her pay in cash, nor did she report any of her cash income from 2011 through 2014 on her annual tax returns. (Pl.'s Resp. DSMF ¶¶ 94-95.) How-

---

2. The Court notes here that, as in other places in Defendants' briefing, they misconstrue evidence. Often, it appears to be for the purposes of discrediting Plaintiff's testimony, arguing that she has contradicted herself and potentially filed a sham affidavit. Defendants make these arguments in their responses to Plaintiff's Statement of Additional Material Facts and do not mention them in their briefing (with the exception of whether she received an IRS Form W-2 in 2014). In this instance, Defendants argue that Plaintiff testified at her deposition that she did not know whether other managers were paid half by check and half in cash, yet later submitted a contradictory declaration stating that she and other managers were paid in that fashion. (Defs.' Resp. PSAMF ¶ 32.) However, a close reading of the deposition transcript reveals that Plaintiff testified only that she did not know how much sales associates were paid per week (with one possible exception: Jasmine). (Hood Dep. at 139:18-144:2.) At other times, Defendants reference Plaintiff's change in position in an affidavit filed subsequent to her deposition—but then cite Plaintiff's first declaration, which was filed before her deposition. (See, e.g., Defs.' Resp. PSAMF ¶ 20.) The Court also notes at this point that some of the testimony is difficult to follow due to the diction and syntax of both the translated and non-translated portions of the transcript. At times, it appears counsel and the witness are also having a difficult time understanding each other's questions and answers—which does not make it easy for the Court to understand them, either. In this context, the Court does not find Plaintiff's past deposition statements to be contradictory so as to raise material concerns that it is a "sham affidavit."

ever, Plaintiff points out that JeJe did not make Social Security contributions on Plaintiff's behalf for the amounts it paid her in cash, and her retirement eligibility is therefore less than it otherwise would be. (2d Hood Decl. ¶ 37.)

## II. LEGAL STANDARD

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party, and is material if resolving the factual issue might change the suit's outcome under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (1994) (en banc).

When, as here, the non-moving party bears the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. *Fitz-*

*patrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case. *Id.* The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. Fed. R. Civ. P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. DISCUSSION

### A. FLSA executive exemption

The FLSA, which was enacted to protect the health, efficiency and welfare of workers in the United States, requires employers to pay overtime (time and a half) to employees who work more than forty hours per week. 29 U.S.C. § 207(a)(1). However, Section 213(a)(1) exempts from this requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). In light of the comprehensive remedial purposes of the FLSA[3], the Court interprets its provisions liberally in the employee's favor and construes the exemptions narrowly against the employer. *E.g., Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009); *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir.1997); *Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta*, 920 F.2d 800, 804 (11th Cir.1991). The employer bears the burden

---

**3.** The primary purpose of the FLSA is the protection of the nation's employees from detrimental labor conditions and to provide a minimum subsistence wage. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), *reh'g denied* 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005; *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1363 (11th Cir.1997); *see also* 29 U.S.C. §§ 202(a), 206, 207, 212.

of proving its entitlement to an exemption. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir.2008); *Evans*, 131 F.3d at 965. For Defendant to prevail, it must prove the applicability of the exemption by "clear and affirmative evidence." *Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1254 (11th Cir.2001) (quoting *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir.1992)).

As a job title is of little use for exemption purposes, courts look to the tests articulated by the Department of Labor's ("DOL") regulations under the FLSA in assessing the applicability of the executive exemption. *See Morgan*, 551 F.3d at 1265–66. The FLSA's executive exemption applies to an employee: (1) compensated on a salary basis at a rate of not less than $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof[4]; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight[5]. 29 C.F.R. § 541.100(a).

### 1. Genuinely salaried

■ Plaintiff earned a salary of between $700 and $820 per week, yet she disputes that she was genuinely salaried so as to qualify for the executive exemption. Plaintiff points out that her salary was deducted both when she was absent from work due to illness as well as when she did not work due to the store being closed. Defendants respond: 1) that Plaintiff has no actual record of her pay being reduced; 2) that there is no evidence Defendants were ever notified that the reason for an absence was illness; 3) that Defendants were entitled to reduce Plaintiff's pay under certain circumstances, for example, personal days and absences during the last week of employment; and 4) that JeJe had a "regular practice of allowing Ms. Hood to rearrange her schedule to make up for the absences due to illness and other reasons." (Reply at 11-12.)

As explained above, to qualify for the executive exemption, an employee must be paid on a "salary basis." 29 C.F.R. § 541.100(a). An employee is considered to be paid on a salary basis if she "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is *not subject to reduction because of variations in the quality or quantity of the work performed.*" 29 C.F.R. § 541.602(a) (emphasis added). An exception to the "not subject to reduction" rule exists for situations "when an exempt employee is absent from work for one or more full days for

---

4. "When an enterprise has more than one establishment, the employee in charge of each establishment may be considered in charge of a recognized subdivision of the enterprise." 29 C.F.R. § 541.103(b).

5. "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.... It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

personal reasons, *other than sickness* or disability." 29 C.F.R. § 541.602(b)(1) (emphasis added).

Here, resolving all factual disputes and drawing all reasonable inferences in favor of Plaintiff, Defendants reduced Plaintiff's compensation on "several occasions" when she missed full days of work due to illness. (2d Hood Decl. ¶ 14.) While Defendants properly argue that they were not required to compensate her for sick days taken in her last week, *see* 29 C.F.R. § 541.602(b)(6), Plaintiff clearly testifies there were other times when she was out sick and had her compensation reduced by 20 percent. Plaintiff also testifies that her compensation was reduced when Mix 5 was closed due to inclement weather and a nearby fire. That Plaintiff has no record of reductions in her compensation beyond her personal sworn testimony is not a sufficient reason to grant summary judgment in favor of Defendants.

That does not end the analysis, though, because an employer *is* permitted to reduce a salaried employee's compensation "for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability." 29 C.F.R. § 541.602(b)(2). Defendants admit that they had no sick leave plan or policy, (Reply at 11), but they argue that they had a "regular practice of allowing Ms. Hood to rearrange her schedule to make up for the absences due to illness and other reasons." (Reply at 11-12.) Defendants have cited no authority for the proposition that this type of arrangement qualifies as a "bona fide practice" of providing compensation under 29 C.F.R. § 541.602(b)(2), and the Court

doubts that it does. *See* U.S. Department of Labor, Employment Standards Administration, Wage and Hour Division, Opinion Letter FLSA2006-32 (Sept. 14, 2006) *available at* https://www.dol.gov/whd/opinion/FLSA/2006/2006_09_14_32_FLSA.pdf (describing plans and policies that "provide a sufficient amount of leave to allow a reasonable number of absences without loss in pay to exempt employees" so as to qualify as "bona fide").

In addition, Defendants' assertion that they sometimes issued payments of around $50 to correct compensation errors does not alter the analysis or the result. It is true that there are safe harbor provisions that may apply to employers who reimburse employees for improper deductions. *See* 29 C.F.R. §§ 541.603(c) and 603(d). Drawing all evidentiary inferences in the light most favorable to Plaintiff, however, JeJe's Rule 30(b)(6) deposition testimony concerning subsequent reimbursements of $50 or so does not indicate that Plaintiff was subsequently reimbursed for the entirety of any of the 20 percent reductions in compensation she refers to in her testimony. (*See* JeJe 30(b)(6) Deposition at 47:7-17, Doc. 48-4.) Twenty percent of $700, Plaintiff's lowest weekly salary, is $140, so Defendants' evidence that they sometimes reimbursed $50 still would leave Plaintiff about $90 short of full reimbursement.[6]

Thus, a reasonable jury could find, based on Defendants' described arrangement and Plaintiff's evidence that her pay was in fact reduced due to illness absences and store closures, that Plaintiff earned an hourly wage and was not paid on a salary basis. At the same time, a jury could disbelieve Plaintiff and find, among other things, that she never communicated the

---

6. Nor is there any indication that Defendants had "a clearly communicated policy that prohibits the improper pay deductions specified in § 541.602(a) and includes a complaint mechanism," another requirement for the safe harbor in 29 C.F.R. § 541.603(d).

reason for her absences to Defendants. The Court does not resolve credibility issues on a motion for summary judgment, however, so judgment is inappropriate on this issue at this time, either in favor of Defendants or Plaintiff.[7]

### 2. Primary duty

 There is substantial disagreement between the parties over whether Plaintiff's primary duty was management of the Mix 5 store. The Eleventh Circuit has rejected a "categorical approach" to deciding whether an employee is an exempt executive. *Morgan*, 551 F.3d at 1269, 1272 (citing *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (2008) (refusing to hold that store managers are exempt employees "as a matter of law" simply because the employee had some managerial responsibility over a free-standing business location)). Instead, the Eleventh Circuit recognizes that the primary duty inquiry is "necessarily fact-intensive," consistent with the DOL regulation, which provides that the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Rodriguez*, 518 F.3d at 1264; *Morgan*, 551 F.3d at 1269, 1272; 29 C.F.R. § 541.700(a). Indeed, the exemption should "be applied only to those [employees] clearly and unmistakably within the terms and spirit of the exemption." *Morgan*, 551 F.3d at 1269 (quoting *Brock v. Norman's Country Market*, 835 F.2d 823, 826 (11th Cir.1988) (internal quotation omitted)).

Under the DOL regulations implementing the FLSA, "management" generally includes activities such as:

> interviewing, selecting, and training of employees; setting and adjusting their

rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. "Primary duty" is defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Factors to consider when determining the primary duty of an employee include: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* "This analysis specifically requires an examination beyond an employee's title to the specific duties performed by the employee." *Barreto v. Davie Marketplace, LLC*, 331 Fed. Appx. 672, 674 (11th Cir.2009).

While the amount of time spent performing exempt work can be a useful guide

---

7. Although Plaintiff did not affirmatively move for summary judgment in this case, she did suggest in her Response that the Court

should find as a matter of law that Plaintiff was not paid on a salary basis. (Resp. at 7.)

in determining whether exempt work is the primary duty of an employee, it is not dispositive of the primary duty issue. *See* 29 C.F.R. § 541.700(b) (noting that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement" and that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion"); *Morgan*, 551 F.3d at 1270. The DOL regulation provides the following example as to whether an employee's primary duty is considered to be management as opposed to manual labor, production, or sales:

> [managers] in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the [managers] spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such [managers] are closely supervised and earn little more than the nonexempt employees, the [managers] generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

Defendants do not dispute that Plaintiff performed significant non-managerial tasks that were "the bulk" of her duties at Mix 5. (Defs.' Resp. PSAMF ¶¶ 6, 7, 10, 11.) Rather, the crux of Defendant's primary duty argument on summary judgment is two-fold: first, that they do not have sufficient knowledge of Plaintiff's hours to determine if her testimony is accurate; and second, that "Plaintiff's managerial responsibility, authority, and supervisorial duties ... continued throughout her shift while she was performing non-exempt work." (*Id.* ¶ 13.)

The first argument is resolved by reference to the summary judgment reality that Defendants' ignorance of Plaintiff's schedule—and resulting inability to offer any evidence as to the amount of time she spent doing non-exempt tasks—does not, without more, resolve disputes of fact as to Plaintiff's work hours or the break-out of those hours.[8] Plaintiff has offered her sworn testimony as to the amount of time she spent performing non-exempt tasks, and Defendants, while they technically "dispute" this fact, do not offer any evidence to the contrary. A dispute about a material fact is "genuine" if "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Here, a jury most certainly could believe Plaintiff's essentially undisputed testimony and return a verdict in her favor as to the amount of time she spent doing exempt and non-exempt tasks.

Defendants' second argument requires a bit more analysis. Defendants claim that while she was on duty, "she was the manager 100% of the time." And "[e]ven if she spent 90% of the time performing non-exempt duties as she claims, that does not equate to Ms. Hood being the manager for only 10% of the time." (Defs.' Reply at 5 (citing *Grace v. Family Dollar Stores*, 637 F.3d 508, 516 (4th Cir.2011)). "When it comes to deciding whether an employee is an executive within the meaning of the FLSA, [though,] the answer is in the de-

---

**8.** It would have been Defendants' duty to keep records of Plaintiff's hours worked if Plaintiff indeed worked in a non-exempt capacity. *See* 29 U.S.C. § 211(c) (obligating every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him").

tails." *Rodriguez*, 518 F.3d at 1264; *Morgan*, 551 F.3d at 1269, 1272–73 (rejecting employer's argument that store managers were exempt as a matter of law because they were "in charge" of the store).

In three recent cases, the Eleventh Circuit analyzed the "primary duty" issue under factually similar circumstances and found that the question of whether the employee is exempt is one for the jury where there is evidence that: (1) a store manager spends 80 to 90 percent of his time performing nonexempt, manual labor (such as stocking shelves, running the cash registers, unloading trucks, and cleaning the store) and spends only 10 to 20 percent of his time performing exempt managerial type work; (2) a store manager is expected to perform a significant amount of manual labor that is not merely an incidental portion of a managerial job; (3) a store manager rarely exercises discretion because either the company's guidelines or the area/district managers' directives controlled virtually every aspect of a store's day-to-day operations; (4) the store manager had little freedom from direct supervision or oversight; and (5) the store manager's salary or effective hourly wage was only slightly higher than his non-exempt co-workers. *See Morgan*, 551 F.3d 1233 (denying employer's post-trial motion for judgment as a matter of law and affirming jury verdict in favor of employee); *Rodriguez*, 518 F.3d 1259 (same); *Barreto*, 331 Fed.Appx. 672 (vacating district court's grant of summary judgment for employer where the evidence, when viewed in the light most favorable to the employee, demonstrated questions of fact as to whether the employee's "primary duty" consisted of management).

In *Rodriguez*, even though the Court agreed with the employer that it presented abundant documentary evidence and testimony at trial indicating that the store managers' primary duty was management,

the Court held that there was also sufficient evidence from which a reasonable jury could have determined that the store managers' primary duty was not management. 518 F.3d at 1264–65. Specifically, the Court found the following evidence as a whole was enough for a reasonable jury to conclude that the primary duty of the store managers was not management: (1) testimony from managers that they spent no more than 10 percent of their time on management-related duties and the majority of their time engaging in sales and sales-related duties such as customer service, merchandise receiving, and stacking shelves; (2) testimony from store managers that they lacked authority and discretion over their respective stores and employees, the stores were actually run by district managers, and they could not make any management decisions without first seeking approval from their district managers; and (3) testimony that the managers' hourly rate of pay (computed by dividing their weekly salary by the number of hours they worked each week) was comparable to those of the sales associates or assistant managers in their stores. *Id.* at 1265.

In reversing a district court's grant of summary judgment to an employer under the FLSA's executive employee exemption, *Barreto* noted that "where an employee spends the majority of his time on non-exempt work and has admittedly few managerial-type obligations, there is at least a factual question as to whether the non-exempt duties are comparatively more important than the exempt duties. Such determinations of fact in the face of conflicting evidence are within the exclusive province of a jury." 331 Fed.Appx. at 675, n. 1 (citing *Morgan*, 551 F.3d at 1269). Thus, it is clear that "[w]here an issue turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the

question, with the result hanging in the balance," and judgment as a matter of law is therefore not appropriate. *Rodriguez*, 518 F.3d at 1264-65; *Morgan*, 551 F.3d at 1269.

Defendants contend that the undisputed facts demonstrate that as a store manager, Plaintiff performed management duties and that management was her primary duty as a matter of law. But, resolving all factual disputes in Plaintiff's favor, the record also demonstrates that Plaintiff: (1) spent the overwhelming majority of her time (roughly 95 percent) performing non-managerial and sales-related duties; and (2) lacked complete discretion and independence regarding such things as product purchases and inventory, controlling the store's budget, establishing or altering other employees' pay, setting up the store as she saw fit, and scheduling her days off.

Plaintiff admits that she performed the following types of managerial duties which fall under 29 C.F.R. § 541.102's definition of "management":

- interviewing applicants for employment and making hiring recommendations (Hood Dep. 137);
- setting employee work schedules, training employees (along with other experienced employees), and directing the work of employees (Pl.'s Resp. DSMF ¶¶ 34, 46; Hood Dep. 121);
- at least twice providing employee performance appraisals (Hood Dep. at 102-03, 137-38); and
- while she was on duty, having the authority to approve employee breaks and reprimand employees for any shortcomings. (Pl.'s Resp. DSMF ¶¶ 50, 51.)

However, Plaintiff testified that in her typical eleven-hour workday (10:00 AM to after 9:00 PM), not more than 30 minutes (or roughly 5 percent of the day) was spent performing these managerial func-

tions. (2d Hood Decl. ¶ 2.) The rest of a typical workday "was spent doing the same work as performed by the hourly paid sales associates." (*Id.*)

In addition to the comparatively small amount of time per day during which Plaintiff performed the above managerial tasks, some clarifications are warranted as to the performance of the substantive functions themselves. Although Plaintiff interviewed applicants and made hiring recommendations, she states she had no authority to hire or fire employees. (1st Hood Decl. ¶ 11.) Defendants offer evidence that Plaintiff had "absolute authority to directly hire, reprimand, and fire the sales staff." (Lee Decl. ¶ 11.) Resolving this dispute in the non-movant's favor at this stage, however, the Court accepts that she did not have that authority. Similarly, despite Defendants' evidence to the contrary, the Court accepts at this stage that the sales associates' work schedules Plaintiff prepared each week were subject to Defendants' ultimate approval. (1st Hood Decl. ¶ 11. *But see* Lee Decl. ¶ 12.) And while Plaintiff trained new employees, the training appears to have been minimal and other experienced employees also trained new hires. (Hood Dep. at 121.)

According to Plaintiff's version of the evidence, Defendants and the other Lee family members constantly gave Plaintiff instruction on how to set up the store, to rearrange the store, and to change store appearance—and frequently did these things while Plaintiff was off work and they were in the store. Plaintiff also communicated with Defendant Lee through Jason and Jinhee Lee on a daily basis. (Defs.' Resp. PSAMF ¶¶ 45-47.) In those communications, Plaintiff received direction from Jason and Jinhee Lee on a variety of issues beyond those listed above. (*Id.* ¶¶ 48-49.)

As for store security, Plaintiff provided evidence that her duties were essentially the same as any of the sales associates'. (2d Hood Decl. ¶ 19.) Both Plaintiff and the sales associates had the ability to see the store's security camera footage. (Hood Dep. 112.) It is undisputed that Plaintiff had a higher level of access to the store's point of sale system, though. (JeJe 30(b)(6) Dep. at 121; Lee Decl. ¶ 13.)

Furthermore, the record indicates that Plaintiff spent the remaining 95 percent of her workday devoted to the following sales-related tasks:

- cleaning and mopping the store, (Defs.' Resp. PSAMF ¶ 6);
- re-folding clothes that had been unfolded by customers, (*id.*);
- waiting on customers, (*id.*);
- un-boxing and displaying new inventory, (*id.*); and
- hanging clothes and attaching price tags. (*Id.* ¶ 10.)

The "relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" is another factor under 29 C.F.R. § 541.700(a). A breakdown of a salaried employee's wages into an effective hourly rate is the method of comparison employed by the Eleventh Circuit. *See Morgan*, 551 F.3d at 1271; *Rodriguez*, 518 F.3d at 1265. Here, depending on the number of hours worked per week, Plaintiff's effective hourly rate ranged from $9.47 to $15.61.[9] "The highest

paid associate earned . . . an hourly wage of $8.25[.]" (Lee Decl. ¶ 10.) Based on this evidence, when viewed most favorably to Plaintiff, a reasonable jury could conclude that Plaintiff did not always make significantly more than her coworkers by the hour if she could have made $9.47 per hour when her coworkers made $8.25 per hour.

Finally, Defendants contend that Plaintiff is exempt even though she spent most of her time doing non-managerial work under 29 C.F.R. § 541.106 because "[c]oncurrent performance of exempt and nonexempt work is explicitly recognized as a managerial duty by the Department of Labor's regulations." (Reply at 5.) "[C]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis." 29 C.F.R. § 541.106(a).

The Eleventh Circuit addressed this issue in *Morgan*, finding that the evidence there did not show the plaintiffs performed managerial and non-managerial tasks concurrently:

Rather, there was evidence that, by and large, the store managers performed most managerial tasks before the store opened and after it closed. The amount of manual labor overwhelmed their capacity to perform managerial duties con-

---

9. This calculation was done by dividing Plaintiff's highest weekly salary ($820) by the fewest number of hours she worked per week (11 hours * 5 days = 55 hours) and dividing Plaintiff's lowest weekly salary ($700) by the greatest number of hours she worked per week during the holidays (13 hours * 6 days = 78 hours). The evidence is unclear as to whether the lowest weekly salary was in fact earned for the week during which Plaintiff worked the most hours because Defendants

did not keep records of Plaintiff's hours worked as would be required under the Act if Plaintiff indeed worked in a non-exempt capacity. *See* 29 U.S.C. § 211(c). At any rate, the Court finds this is a reasonable inference it is required to draw in favor of the non-movant at this stage. Plaintiff's annual bonus of around $2000 was also factored into the weekly calculation ($2000 / 52 = $38.46 per week).

currently during store hours. Other evidence showed the nature of the manual labor prevented store managers from performing managerial duties concurrently. For example, a store manager unloading a truck and stocking the storeroom was not concurrently supervising the cashier out front. 551 F.3d at 1272–73. Defendant here has not presented sufficient evidence to demonstrate as a matter of law that Plaintiff was performing her managerial and non-managerial functions concurrently on a continual basis. Defendants argue only that she was responsible for running the store at the same time she was spending significant time performing non-managerial tasks. But, as in *Morgan*, some of those tasks, such as assisting customers, would have required Plaintiff's full attention, rendering her unable to perform any other tasks concurrently.

Construing the evidence viewed in the light most favorable to Plaintiff, the Court cannot find Plaintiff's managerial duties were comparatively far more important than her non-managerial duties. Instead, this question involves weighing of the evidence that is inappropriate at this stage of the case and must be performed by the jury. As the court finds that a genuine question of material fact exists regarding whether Plaintiff's primary duty was management, it is not necessary for the Court to reach the other factors of the executive exemption test at this juncture. *See Barreto*, 331 Fed.Appx. at 678. Accordingly, Defendants' Motion for Summary Judgment with respect to the executive exemption is **DENIED.**

### B. Tax fraud

■ JeJe argues it is entitled to summary judgment on Plaintiff's tax fraud claim because it did not willfully file fraudulent tax returns and because Plaintiff did not suffer any damages as a proximate result of filing IRS Form 1099-MISCs instead of Form W-2s on Plaintiff's compensation. Plaintiff responds that there is sufficient circumstantial evidence of willfulness—and sufficient direct evidence of Plaintiff's proximate damages—such that summary judgment should be denied.

Title 26, Section 7434 provides a private cause of action for civil damages for fraudulent filing of tax information returns:

(a) **In general.**—If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

(b) **Damages.**—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the greater of $5,000 or the sum of—

(1) any actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing),

(2) the costs of the action, and

(3) in the court's discretion, reasonable attorneys' fees.

26 U.S.C. § 7434 (2012).

■ Courts agree that the elements of the claim are: "(1) Defendants issued an information return; (2) The information return was fraudulent; and (3) Defendants willfully issued a fraudulent information return." *Leon v. Tapas & Tintos, Inc.,* 51 F.Supp.3d 1290, 1297 (S.D.Fla.2014). *See also Bolling v. PP & G, Inc.,* No. WDQ–15–911, 2015 WL 9255330, at *6 (D.Md. Dec. 17, 2015); *Seijo v. Casa Salsa, Inc.,* 2013 WL 6184969, at *7 (S.D.Fla. Nov. 25, 2013); *Pitcher v. Waldman,* No. 1:11–CV–

148–HJW, 2012 WL 5269060, at *4 (S.D.Ohio Oct. 23, 2012), aff'd, 591 Fed. Appx. 466 (6th Cir.2015). Courts disagree, however, as to whether an information return is "fraudulent" under the second element when the *type of form* issued is the improper one, or, alternatively, if the return must misrepresent the *amount of payments* made in order to qualify as "fraudulent."[10] It matters not in this action, because Plaintiff provides evidence of both:

> JeJe paid all wages to hourly sales associates by check; made applicable deductions for federal and state taxes, Social Security and Medicare; and issued IRS Forms W-2 to them.

> JeJe usually paid my compensation **and the compensation of the other managers** half in cash, half by check. [ ] JeJe issued **us** IRS Forms 1099-MISC for the amounts it paid by check only.

(2d Hood Decl. ¶¶ 6-7 (emphasis added).)

As to the third element of the test, the Eleventh Circuit has not addressed the meaning of "willfulness" in this statute, but "circuit courts around the country have found that 'willfulness' in the context of the statute connotes a voluntary, intentional violation of a legal duty, and that tax fraud typically requires intentional wrongdoing." *Leon*, 51 F.Supp.3d at 1298 (internal quotation marks omitted) (citing *Van-*

*denheede v. Vecchio*, 541 Fed.Appx. 577, 580 (6th Cir.2013); *Maciel v. Comm'r*, 489 F.3d 1018, 1026 (9th Cir.2007); *Granado v. Comm'r*, 792 F.2d 91, 93 (7th Cir.1986)). *See also Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) ("Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."). Courts have also interpreted willfulness under 26 U.S.C. § 7434 to require "a component of deceitfulness or bad faith." *Nash v. United States*, No. 4:02–CV–1725–AGF, 2004 WL 3176885, at *3 (E.D.Mo. Oct. 12, 2004). *See also Seijo*, 2013 WL 6184969, at *7; *Pitcher*, 2012 WL 5269060, at *9; *Cavoto v. Hayes*, No. 08–C–6957, 2010 WL 2679973, at *4 (N.D.Ill. July 1, 2010) (citing *Nash*, 2004 WL 3176885, at *3), aff'd, 634 F.3d 921 (7th Cir.2011).

JeJe contends summary judgment should be granted as to its willful fraud because the undisputed evidence shows it did not know the difference between a 1099 and a W-2 and because it actually would have benefitted by paying Plaintiff entirely by check and claiming all of that compensation as a business expense.[11] Plaintiff counters that there is sufficient

---

10. *Compare Leon*, 51 F.Supp.3d at 1298 ("[T]he Court finds that for purposes of 26 U.S.C. § 7434, Plaintiff has sufficiently alleged that Defendant Tapas & Tintos issued Form 1099—MISC's for the payments it made to Plaintiff, and that the issued forms violated Section 7434 where Plaintiff could properly be classified as an employee rather than an independent contractor.") *and Seijo*, 2013 WL 6184969, at *7 ("Seijo has produced evidence from which a reasonable factfinder could conclude that Casa Salsa violated § 7434 by filing Form 1099–MISC's for the payments it made to her because that form is used to record payments made to independent contractors and Seijo was not an independent

contractor.") *with Liverett v. Torres Advanced Enter. Sols. LLC*, No. 1:16–CV–339, 192 F. Supp. 3d 648, 655, 2016 WL 3582068, at *5 (E.D.Va. June 28, 2016) (finding, after an exhaustive statutory construction analysis, that "§ 7434(a) must be read to provide a private cause of action only where a defendant willfully files information returns that misrepresent the amount of payments made.")

11. Defendant also makes several *ad hominem* attacks on Plaintiff's character in its briefing on this issue. Defendant is advised to refrain from such attacks in the future.

circumstantial evidence for a reasonable jury to conclude that JeJe must have known the difference between the forms because JeJe appears to have been surgically precise in issuing half-salary 1099s to Korean-speaking managers only. Plaintiff also points out that she filled out a W-4 form upon being hired.

Plaintiff argues that, like other species of fraud, § 7434 fraudulent issuance of returns can be proven by circumstantial evidence, and Defendant JeJe did not explicitly disagree. (*See* Resp. at 22 (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir.1998).) *See also United States v. Hawkins*, 905 F.2d 1489, 1496 (11th Cir. 1990) (explaining that the Government need not produce direct proof of scienter in a fraud case, but, instead, can rely on circumstantial evidence of criminal intent). At least one court has denied summary judgment to a defendant explicitly due to circumstantial evidence of intent to file fraudulent returns. *See Pitcher v. Waldman*, No. 1:11–CV–148, 2012 WL 5269060, at *9 (S.D.Ohio Oct. 23, 2012), *report and recommendation adopted*, No. C–1–11–148, 2013 WL 866510 (S.D.Ohio Mar. 7, 2013). A bench trial was eventually held in that case, wherein again the district judge relied upon circumstantial evidence of fraud to find defendants liable for willful filing of fraudulent information returns under § 7434. That bench order was affirmed on appeal. *See Pitcher*, 2014 WL 1302551, at *9, *aff'd*, 591 Fed.Appx. 466 (6th Cir. 2015). The Court is therefore persuaded that circumstantial evidence is an acceptable way to prove willful filing of fraudulent returns under § 7434.

"In our complex tax system, uncertainty often arises even among taxpayers who earnestly wish to follow the law, and it is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." *U.S. v. Bishop*, 412 U.S. 346, 360–61, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973) (quoting *Spies v. U.S.*, 317 U.S. 492, 496, 63 S.Ct. 364, 87 L.Ed. 418 (1943)) (internal marks omitted). Resolving all factual disputes and drawing all reasonable inferences in Plaintiff's favor, however, there is sufficient evidence from which a reasonable jury could find Defendant JeJe did not make a mere innocent error, but voluntarily and intentionally violated its obligations under federal tax law both to issue Plaintiff a W-2 instead of a 1099 and to include in that form all of Plaintiff's compensation rather than only the compensation paid to her by check. Specifically, JeJe had Plaintiff fill out a W-4 when it hired her, which a reasonable jury could infer would not have made sense if JeJe intended to issue Plaintiff a 1099-MISC. JeJe then paid all of its non-Korean-speaking sales associates wholly by check and issued them W-2s covering all of their income. JeJe treated another group—Korean-speaking managers—differently, paying them half in cash and half by check, and then issuing them 1099s covering only the check payments.

These facts are subject to materially different interpretations. As JeJe contends, it could be that JeJe did not know the difference between the forms, or that all compensation must be recorded, and simply made some mistakes. But a reasonable jury could also find, particularly based on the differential treatment of an entire class of employees, that JeJe knew what it was doing and intentionally issued the wrong forms containing the wrong amounts. A reasonable jury could find that such voluntary, intentional issuance of fraudulent returns demonstrated some amount of deceitfulness and/or bad faith, too.

The result here is therefore the same as the one in *Pitcher*:

In short, proof of an error is not tantamount to proof of fraud. Because the

facts presented are susceptible to differing interpretations, both concerning whether any error was made by filing [1099 forms containing incorrect compensation amounts] and whether any of the alleged errors were ["willful" or] "fraudulent," summary judgment must be denied.

*Pitcher*, 2012 WL 5269060, at *9.

Finally, the Court turns to whether summary judgment is nonetheless appropriate on the tax fraud claim because, as JeJe argues, there is insufficient evidence that its actions proximately caused any damage to Plaintiff. Defendant JeJe argues that Plaintiff actually benefitted from the arrangement because she did not report any of her cash earnings in her personal IRS filings "allowing her to receive more money up front" rather than paid to social security and Medicare taxes. (Mot. at 24.) Plaintiff counters that, "[a]s the direct result of JeJe's decision to treat me [as] a 1099 independent contractor, it made no Social Security contributions on my behalf. Consequently, my Social Security retirement eligibility is less than it would be had JeJe not filed a fraudulent Form 1099-MISC."[12] (2d Hood Decl. ¶ 37.) The Court does not need to reach a decision yet as to whether this evidence standing alone may not be sufficient at trial to withstand a motion for directed verdict because Plaintiff provides sufficient evidence at this stage to create a genuine dispute as to the proximate cause of Plaintiff's damages—no matter whether those damages arose from filing the wrong form or a return that covered the wrong amount. Summary judgment is therefore inappropriate based on this issue as well.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 48] is **DENIED**.

The Court finds that the disputes between the parties rationally should be capable of settlement, particularly now that the Court has made the above determinations. Accordingly, this matter is **REFERRED** to the next available Magistrate Judge for mediation. Mediation **SHALL** conclude within 45 days of the entry of this Order. In the event the parties fail to reach an agreement, they are **DIRECTED** to submit their proposed Consolidated Pretrial Order within 15 days of the conclusion of the mediation and the case **SHALL** be placed on the next available trial calendar. The parties are **DIRECTED** to advise the Court how many days they estimate the trial will take within 10 days of the entry of this Order.

**IT IS SO ORDERED** this 12th day of September, 2016.

---

**12.** The Court additionally notes that Plaintiff would have paid a higher federal employment tax based on the Defendant's treatment of her as an independent contractor (via tax form 1099) as opposed to payment to her of salary or wages (via W-2). On the other hand, Plaintiff paid no taxes on her receipt of cash in lieu of wages or salary payments.