T.C. Memo. 2019-123

UNITED STATES TAX COURT

RAYMOND CHICO AND RUBY CHICO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22264-16.            Filed September 16, 2019.

<u>Henry G. Wykowski</u> and <u>Matthew A. Williams</u>, for petitioners.

<u>Cameron W. Carr</u> and <u>Thomas R. Mackinson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>: Respondent determined deficiencies and penalties under section 6663 with respect to petitioners' Federal income tax for 2010, 2011, and 2012 (years at issue) as follows:[1]

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice

(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6663 |
|------|-----------|-------------------|
| 2010 | $76,414 | $57,311 |
| 2011 | 61,712 | 46,284 |
| 2012 | 45,690 | 34,268 |

Respondent determined as an alternative to the fraud penalties that petitioners are liable for accuracy-related penalties under section 6662(a).

After concessions,[2] the issues remaining for decision are whether petitioners: (1) received and failed to report gross receipts with respect to their business, Doobtubes, which marketed and sold marijuana cigarette containers; (2) are entitled to costs of goods sold with respect to Doobtubes; (3) are entitled to deductions reported on Schedules C, Profit or Loss From Business (Sole Proprietorship), with respect to Doobtubes; (4) received and failed to report constructive dividends from Lakewood Patient Resource Center, Inc. (Lakewood),

---

[1](...continued) and Procedure, unless otherwise indicated. Monetary amounts are rounded to the nearest dollar.

[2]Petitioners concede that they received interest income of $7 in 2010, $36 in 2011, and $1,072 in 2012; ordinary dividends of $2,568 in 2011; and capital gain of $1,805 in 2010. Respondent concedes that for 2010 petitioners substantiated $29,835 for supplies related to the operation of Doobtubes, LLC (Doobtubes), their business reported on Schedules C, Profit or Loss From Business (Sole Proprietorship), as well as depreciation of $12,007 for each of the years 2011 and 2012.

**[*3]** in 2010 and 2011, while it was operating a marijuana dispensary as a C corporation; (5) failed to report passthrough income from Lakewood for 2011, after it made an S corporation election; (6) received and failed to report rental income; (7) are entitled to depreciation expense deductions greater than respondent has conceded for 2011 and 2012; and (8) are entitled to the net operating loss deduction claimed on their 2012 income tax return. Also at issue is whether petitioner Raymond Chico is liable for the section 6663 civil fraud penalty (or alternatively the section 6662(a) accuracy-related penalty) for each year at issue, and whether petitioner Ruby Chico is liable for the section 6662(a) accuracy-related penalty.[3]

---

[3]This case was tried before another Judge who is no longer serving with this Court. The parties consented to having the case decided by another judicial officer on the basis of the trial record.

[*4]                                         FINDINGS OF FACT[4]

Some of the facts have been stipulated and are so found.  The stipulation of

facts and the attached exhibits are incorporated by this reference.  When they

petitioned this Court, petitioners resided in California.

I.       Raymond Chico's Background

Mr. Chico worked as a land surveyor for about 20 years.  During the winter

of 2002, when outdoor work was light, he began preparing tax returns for several

of his acquaintances.  At a time unspecified in the record he established Ray's Tax

Service as a side business to prepare tax returns for "blue collar or, you know,

regular everyday working people."[5]  The Internal Revenue Service (IRS) issued

him a Preparer Tax Identification Number, and he was registered from 2003

through 2016 with the California Tax Education Counsel (CTEC) to prepare and

file tax returns.  His continuing education courses in Federal income taxation

included courses in business return preparation.  At his busiest Mr. Chico prepared

---

[4]Petitioners filed an answering brief but failed therein to set forth objections to respondent's proposed findings of fact as directed by Rule 151(e)(3). Accordingly, we deem petitioners to have conceded respondent's proposed findings of fact to be correct except to the extent that petitioners' proposed findings of fact are clearly inconsistent therewith.  See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), aff'd, 353 F.3d 1181 (10th Cir. 2003).

[5]The record refers to Ray's Tax Service as a "Schedule C business".  We therefore treat Ray's Tax Service as an unspecified flowthrough entity.

[*5] about 73 tax returns per year; during the years at issue he prepared about 40 tax returns per year.

In 2007 Mr. Chico was diagnosed with cancer, and he began chemotherapy treatments in June of that year. Because of the severe side effects, he had to stop working as a land surveyor. To alleviate the side effects he began to use marijuana cigarettes. Once his cancer went into remission, he became an entrepreneur. During the years at issue he engaged in several business activities: (1) rental of portions of petitioners' marital home to third parties; (2) Doobtubes, which marketed and sold marijuana cigarette containers; (3) Lakewood, a Colorado corporation which operated a marijuana dispensary; and (4) the aforementioned Ray's Tax Services.

Mr. Chico prepared petitioners' joint Forms 1040, U.S. Individual Income Tax Return, for 2010, 2011, and 2012; the returns were timely filed on September 21, 2011, April 15, 2012, and September 5, 2013, respectively. Two Schedules C with respect to Doobtubes and Ray's Tax Service were attached to each year's Form 1040, as was a Schedule E, Supplemental Income and Loss, with respect to petitioners' rental income.

[*6] II.     Examination of Petitioners' Income Tax Returns

The IRS selected petitioners' 2010 Form 1040 for examination. After performing an initial deposits and financial statement analysis, the IRS office auditor discovered indications of unreported income. The examination was transferred to Revenue Agent Ryan Scott for a field examination. Revenue Agent Scott expanded the examination to include 2011 and 2012. He began his audit by issuing an information document request (IDR) to petitioners and their then attorney, Jerome Hanley, on January 13, 2014. The IDR sought copies of tax documents, bank and other financial institution account information, and records regarding all of petitioners' businesses. Although Mr. Chico provided some documents to Mr. Hanley, Revenue Agent Scott never received any response. After examining the information he had, Revenue Agent Scott discovered that in 2010 petitioners held 13 bank accounts.

After summoning the banks holding petitioners' accounts, Revenue Agent Scott reconstructed their income using the bank deposits method.[6] Creating spreadsheets to analyze every account transaction, he categorized all identifiable transactions as (1) deposits (taxable inflow transactions), (2) credits (nontaxable

---

[6] As part of his bank deposits analysis, Revenue Agent Scott analyzed 13 bank accounts for petitioners' 2010 tax year, 10 bank accounts for their 2011 tax year, and 6 bank accounts for their 2012 tax year.

[*7] inflow transactions),[7] (3) withdrawals (deductible expense outflow transactions), or (4) transfers (non-tax-related outflow transactions).

Revenue Agent Scott sent summonses to Mr. Hanley and petitioners for additional records and information. None of the requested information was provided. After additional requests to meet with petitioners failed to elicit any response, the Department of Justice commenced summons enforcement in District Court. Petitioners then agreed to meet with Revenue Agent Scott and another IRS representative, Caitlin Romey, on February 12, 2016. At this meeting petitioners answered some of Revenue Agent Scott's questions but declined to answer others, invoking their Fifth Amendment rights.

Ultimately Revenue Agent Scott determined that petitioners had underreported income with respect to (1) rental income received from the rental of portions of their marital home, (2) Doobtubes' gross receipts, and (3) dividends and passthrough income from Lakewood. Revenue Agent Scott further determined that petitioners were not entitled to deductions in the amounts claimed with respect to (1) the rental of portions of their marital home, (2) Doobtubes, and

---

[7]For instance, in his bank deposits analysis Revenue Agent Scott identified $186,000 of transfers from petitioners' Charles Schwab account, classified them as "credits" for nontaxable inflow transactions, and excluded them from petitioners' taxable income.

[*8] (3) a net operating loss reported for 2012.  These same determinations are reflected in the notice of deficiency.  We will address these matters in turn.

III.    Petitioners' Rental of Their Home

Petitioners purchased their marital home in 2005 for $935,000.  The county's 2005 supplemental property tax statement allocated $280,500 of the property value to land and $654,500 to improvements.  The home consisted of three buildings:  (1) a duplex encompassing the 1,509-square-foot main home in which petitioners and their son lived and in which Mr. Chico operated his businesses, plus a 1,000-square-foot unit (Unit 2) that was rented to a third party; (2) a 1,054-square-foot two-car garage, part of which was used entirely in the operation of Doobtubes and another part of which, a 750-square-foot unit (Unit 1), was rented to another party; and (3) a 292-square-foot storage unit, of which about 195-square feet was rented as part of Unit 2's lease.  Consequently, as indicated by these numbers, about 50.45% of the marital home was rented during the years at issue.

On Schedule E of their 2010 Form 1040, petitioners reported rents received of $12,000 and no expenses.  On Schedule E of their 2011 Form 1040 they reported rents received of $22,200, cleaning and maintenance expenses of $824, repairs of $2,374, and depreciation of $22,438, resulting in a loss of $3,436.  On

[*9] Schedule E of their 2012 Form 1040, they reported rents received of $22,500, cleaning and maintenance expenses of $600, legal and other professional fees of $1,900, repairs of $1,472, and depreciation of $22,438, resulting in a loss of $3,910.

Petitioners failed to provide Revenue Agent Scott the rental agreements for Unit 1 and Unit 2 or any books or records. Consequently, he conducted a bank deposits analysis. He added the deposits from all checks that had the word "rent" in the memo field and determined that petitioners had underreported their rental income by $156 for 2010, $4,971 for 2011, and $4,110 for 2012. Petitioners also failed to respond to Revenue Agent Scott's requests for documentation with respect to the property's depreciation. Revenue Agent Scott therefore disallowed all of the reported depreciation.[8]

IV.   Doobtubes

After undergoing chemotherapy, Mr. Chico began to manufacture a prototype device which he called a "doob tube" to store and transport marijuana cigarettes. The doob tube was a clear plastic cylindrical container imprinted with the words "California Compassion Use Act Health and Safety Code 11362.5" and

---

[8]As noted, in this proceeding respondent has conceded that petitioners may deduct a depreciation expense of $12,007 for each of the years 2011 and 2012.

[*10] "[u]se only as directed by a physician".  At a time not disclosed in the record, Mr. Chico established Doobtubes to market the product.  During the years at issue he operated the business out of the marital residence.  The home's two-car garage (other than Unit 1) was used entirely to store inventory.  The main home, including the living room, kitchen, and a hallway, was used to process the doob tubes.  Doobtubes did not pay rent for the use of the marital residence, and petitioners did not claim any deductions for the space in their home used in the business.

Mr. Chico made all purchases for Doobtubes on a single American Express credit card.  Although the record is not entirely clear, it appears that Doobtubes' customers were often marijuana dispensaries.  Customers generally paid via credit card, but some customers paid by check, and several dispensaries were cash-only businesses.

On April 14, 2010, Chris Miller agreed to transfer to Mr. Chico, in exchange for $10,000, the trademarks for "Dube Tubes".[9]

---

[9]At trial and on brief, respondent acknowledged that the $10,000 purchase price was for an intangible asset, which he sometimes refers to as a "patent".  The agreement called for Mr. Chico to pay Mr. Miller $5,000 upon execution of the agreement and to make two additional payments of $2,500 each on August 13 and December 13, 2010.

**[\*11]** On a Schedule C for 2010, petitioners reported gross receipts of $48,000, cost of goods sold of $15,000, and gross income of $63,000 with respect to Doobtubes.[10] After deducting expenses totaling $71,726, the 2010 Schedule C reported a net loss of $8,726. On a Schedule C for 2011, petitioners reported gross receipts of $162,272, cost of goods sold of $125,211, returns and allowances of $957, and gross income of $36,104 with respect to Doobtubes. After deducting expenses totaling $38,014, the 2011 Schedule C reported a net loss of $1,910. On a Schedule C for 2012 petitioners reported gross receipts of $189,429, cost of goods sold of $116,275, returns and allowances of $175, and gross income of $72,979 with respect to Doobtubes. After deducting expenses totaling $53,604, the 2012 Schedule C reported a net profit of $19,375.

Because petitioners failed to respond to Revenue Agent Scott's request for information, he conducted a bank deposits analysis. He observed that one of petitioners' Federal credit union accounts ending in 68-26 had the notation "Doob Tubes". He determined that Doobtubes' gross receipts were $177,413 for 2010, $205,589 for 2011, and $223,973 for 2012. He did not adjust Doobtubes' cost of goods sold for 2010 but disallowed this item entirely for 2011 and 2012. He

---

[10]For reasons unexplained in the record, on their 2010 tax return petitioners erroneously <u>added</u> $15,000 of cost of goods sold to Doobtubes' gross receipts instead of <u>subtracting</u> that amount. <u>See</u> <u>infra</u> note 18.

[*12] determined that petitioners had understated Doobtubes' income by $114,413 for 2010, $43,317 for 2011, and $34,544 for 2012.

Revenue Agent Scott further determined that the deductions claimed on those Schedules C for 2010, 2011, and 2012, including car and truck, supply, and travel expenses, should be disallowed in their entirety for lack of substantiation.[11]

## V.    Lakewood

In 2009 Mr. Chico established Lakewood as a C corporation in Colorado. He served as Lakewood's chief financial officer and held signatory authority over the corporation's bank accounts throughout its existence. Lakewood operated a marijuana dispensary and provided other services, including transporting patients to doctors' offices and delivering medication. In 2010 Mr. Chico owned 50% of the corporation's shares; a second individual, Andre Bustos, owned the remaining shares. The parties stipulated that by the beginning of 2011, however, Mr. Chico had become the sole shareholder of Lakewood.[12] Corporate Authorization

[11]As noted, in this proceeding respondent has conceded that petitioners have substantiated $29,835 of Doobtubes' 2010 supply expenses.

[12]In the joint first stipulation of facts, petitioners reserved an objection to this stipulation on the grounds that it was "vague and ambiguous." At trial, however, upon questioning by the Court about this objection, petitioners' counsel conceded: "Admittedly, Your Honor, nothing is vague or ambiguous about that sentence." Accordingly, the Court overruled the objection.

**[\*13]** Resolution No. 396169, dated December 14, 2010, assigned all corporate powers to Mr. Chico, and Mr. Bustos' name was crossed out on the corporate documents. During 2011 Mr. Bustos received only two payments from Lakewood, totaling approximately $2,000.[13] When, at the February 12, 2016, interview, Revenue Agent Scott questioned Mr. Chico regarding Mr. Bustos' ownership interest in Lakewood in 2011, he declined to answer, invoking his Fifth Amendment rights.

In January 2011 Mr. Chico filed an S corporation election for Lakewood, effective January 1, 2011. The corporation ceased operations in March 2011 because its operating license was suspended. Lakewood's counsel failed to appear at the corporation's license renewal hearing and then failed to appear at the hearing held to address the license suspension. These lapses resulted in the permanent loss of Lakewood's operating license, forcing it to close.

Lakewood failed to file Federal income tax returns for 2010 and 2011. Petitioners did not expressly reference Lakewood on their 2010 and 2011 Forms 1040 but on line 21 of their 2010 Form 1040 reported $48,299 of dividends from Lakewood as "Other income".

---

[13]One payment for $93 was reimbursement for meals; the other payment was described by Revenue Agent Scott as a distribution. These appear to be payments made in closing out Mr. Bustos' ownership interest in Lakewood.

[*14] Revenue Agent Scott discovered Lakewood's existence and its relationship to Mr. Chico through his bank deposits analysis. He requested that petitioners file tax returns for Lakewood, but they failed to do so. Pursuant to section 6020(b), Revenue Agent Scott prepared a substitute for return for Lakewood for 2010 using the bank deposits method. The substitute for return included only the corporation's gross receipts, as petitioners had failed to provide any records to substantiate cost of goods sold or business expenses.

Revenue Agent Scott calculated that for 2010 Lakewood had current and accumulated earnings and profits of $164,194. He then tracked $104,875 of distributions from Lakewood to petitioners' bank accounts. After subtracting $38,722 of petitioners' contributions to Lakewood,[14] he calculated that for 2010 petitioners had failed to report constructive dividends of $66,153 from Lakewood.[15] Using a similar analysis, Revenue Agent Scott calculated that in 2011 petitioners received $13,465 in distributions from Lakewood accounts. On

---

[14]At trial Revenue Agent Scott testified that he erred in subtracting Mr. Chico's contributions to the corporation and that the correct amount of constructive dividends should have been $104,875. See infra note 23.

[15]This analysis failed to take into account the $48,299 of dividends from Lakewood that petitioners had reported as on line 21, Other income, of their 2010 Form 1040. As part of his analysis, Revenue Agent Scott calculated that in 2010 the other shareholder, Mr. Bustos, received dividends of $44,000. Mr. Bustos received payments periodically throughout 2010.

[*15] the basis of remaining accumulated earnings and profits in the corporation, Revenue Agent Scott determined that in 2011 petitioners received $5,136 of constructive dividends which they failed to report.

With respect to Lakewood's operations as an S corporation in 2011, using the bank deposits method Revenue Agent Scott analyzed all of Lakewood's banking transactions and determined that the corporation had $52,066 of taxable receipts. Petitioners failed to report this passthrough income on their 2011 income tax return. As Mr. Bustos was no longer a shareholder as of the beginning of 2011, respondent allocated this entire amount to Mr. Chico.

VI.  The 2012 Net Operating Loss

Petitioners claimed a net operating loss carryforward of $11,693 on line 21, Other income, of their 2012 Federal income tax return. Although they were required to attach a statement providing information regarding items reported on line 21, petitioners failed to do so. Because no information was provided, respondent disallowed the net operating loss carryforward.

VII.  Determination and Approval of Penalties

The fraud penalties (and in the alternative, section 6662(a) and (b)(2) accuracy-related penalties for underpayments due to substantial understatements of income tax) determined in the notice of deficiency for all of the years at issue

**[\*16]** were proposed by Revenue Agent Scott, who examined petitioners' returns for those years. The penalties were approved in writing by Nicholas Connors, Revenue Agent Scott's immediate supervisor.

## VIII. Notice of Deficiency

On July 25, 2016, respondent issued petitioners a notice of deficiency reflecting the determinations described above. Petitioners timely petitioned this Court.

## OPINION

## I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous.[16]  Rule 142(a); see INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In the case of the fraud penalty under section 6663, the Commissioner bears the burden of proof.  Sec. 7454(a); Rule 142(b).

---

[16]Sec. 7491(a) provides that in certain circumstances the burden of proof with respect to factual matters may shift to the Commissioner.  Petitioners do not argue that sec. 7491(a) applies, nor have they shown that they meet its requirements to shift the burden of proof.  Consequently, the burden of proof remains with petitioners, except as otherwise described herein.

[*17] In cases involving failure to report income, the U.S. Court of Appeals for the Ninth Circuit, to which any appeal in this case would ordinarily lie, see sec. 7482(b)(1)(A), has held that the Commissioner must establish "some evidentiary foundation" linking the taxpayer to an alleged income-producing activity before the presumption of correctness attaches to the deficiency determination. Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). Once the Commissioner has established such a foundation, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the IRS' determinations are arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97. Respondent has established a sufficient evidentiary foundation to satisfy any threshold burden as relates to his determinations of unreported income from petitioners' various business activities.

II. General Principles of Income Taxation

A. Unreported Income

Under section 61(a), "gross income means all income from whatever source derived". See Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). The Supreme Court has repeatedly emphasized the "'sweeping scope' of this section [sec. 61] and its statutory predecessors." Commissioner v. Schleier, 515 U.S. 323,

[*18] 327 (1995) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. at 429).

Section 6001 requires taxpayers to maintain sufficient records to allow the IRS to determine their correct tax liability. Section 446(b) confers broad powers on the Secretary and his delegate, i.e., the Commissioner, to compute the taxable income of taxpayers who fail to keep adequate books and records. See Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner may use indirect methods to reconstruct income. Holland v. United States, 348 U.S. 121 (1954) (upholding the net worth method of reconstructing income). The reconstruction need only be reasonable in the light of all surrounding facts and circumstances. Petzoldt v. Commissioner, 92 T.C. at 687.

Revenue Agent Scott reconstructed petitioners' income using the bank deposits method. A bank deposit is prima facie evidence of income, and the Commissioner need not prove a likely source of that income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977). Courts have often accepted this method of income reconstruction in the absence of adequate books and records. See Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), aff'g

**[*19]** T.C. Memo. 1967-67; Clayton v. Commissioner, 102 T.C. 632, 645 (1994).

The bank deposits method assumes that all money deposited into a taxpayer's

bank account during a given period constitutes taxable income, but the

Commissioner must take into account any nontaxable source or deductible

expense of which he has knowledge. Clayton v. Commissioner, 102 T.C. at 645-

646; DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir.

1992). The Commissioner's calculations need not be completely correct for the

bank deposits analysis to be valid. DiLeo v. Commissioner, 96 T.C. at 868.

Once the Commissioner reconstructs a taxpayer's income and determines a

deficiency, the taxpayer bears the burden of proving that the Commissioner's use

of the bank deposits method is unfair or inaccurate. See Clayton v. Commissioner,

102 T.C. at 645; DiLeo v. Commissioner, 96 T.C. at 882-883. A taxpayer may do

so, in whole or in part, by proving that a deposit is not taxable. See DiLeo v.

Commissioner, 96 T.C. at 882-883.

B.      Substantiation of Deductions

Section 162(a) entitles a taxpayer to deduct "all the ordinary and necessary

expenses paid or incurred during the taxable year in carrying on any trade or

business". In general, no deduction is allowed for personal, living, or family

expenses. Sec. 262.

**[*20]** The taxpayer bears the burden of establishing entitlement to claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; Welch v. Helvering, 290 U.S. at 115; see Rule 142(a). Taxpayers are required to maintain sufficient books and records to substantiate their claimed deductions. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. In certain circumstances, if a taxpayer establishes that a deductible expense has been paid or incurred but is unable to substantiate the precise amount, we may estimate the amount of the deductible expense, bearing heavily against the taxpayer responsible for the inexactitude. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). We cannot estimate deductible expenses, however, unless the taxpayer presents evidence providing a sufficient basis for making an estimate. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Without such basis, any allowance would amount to unguided largesse. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

The Cohan rule is inapplicable to expenses governed by the strict substantiation requirements of section 274. Section 274(d) provides that no deduction or credit shall be allowed for, inter alia, any traveling expense or entertainment expense, or any expense related to listed property as defined in

[*21] section 280F(d)(4),[17] unless the taxpayer substantiates through adequate records or sufficient evidence corroborating his or her own statement the amount of the expense, the time and place of the expense, and the business purpose of the expense. A taxpayer may satisfy the "adequate records" test if he or she maintains an account book, a diary, a log, a statement of expense, trip sheets, or similar records prepared at or near the time of incurring the expenditure and documentary evidence of certain expenditures, such as receipts or paid bills, that show each element of each expenditure or use. See sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). In the absence of adequate records to establish each element of an expense under section 274(d), a taxpayer may alternatively establish each element: "(A) By his own statement, whether written or oral, containing specific information in detail as to such element; and (B) By other corroborative evidence sufficient to establish such element." Sec. 1.274-5T(c)(3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). The taxpayer is not allowed a deduction or credit on the basis of approximations or unsupported testimony. Id. para. (a), 50 Fed. Reg. 46014.

---

[17]Listed property generally includes passenger automobiles, any other property used as a means of transportation, and property generally used for purposes of entertainment, recreation, or amusement. Sec. 280F(d)(4).

**[*22]** III.    Doobtubes

    A.    Gross Receipts

Respondent determined that Doobtubes had unreported gross receipts of $114,413 for 2010, $43,317 for 2011, and $34,544 for 2012.  Because petitioners failed to respond to Revenue Agent Scott's request for information, he was justified in reconstructing their income through the bank deposits method.

Mr. Chico testified that he maintained adequate books and records using QuickBooks, but petitioners never presented any such documents to the IRS or to the Court.  At trial Mr. Chico asserted that Revenue Agent Scott's bank deposits analysis failed to take into account a $353,000 inheritance that he received immediately before the years at issue.  Petitioners assert that portions of this inheritance were periodically transferred from their Charles Schwab account to their bank accounts.

Contrary to petitioners' assertions, however, Revenue Agent Scott's worksheets identified transfers from Charles Schwab, classified those transfers as "credits" for nontaxable inflow transactions, and excluded them from petitioners' taxable income.  Petitioners' Charles Schwab statements for the years at issue show that the following transfers were made in 2010, 2011, and 2012:

[*23]

| Date | Amount |
|------|--------|
| 2/25/10 | $17,000 |
| 3/29/10 | 25,000 |
| 4/13/10 | 7,000 |
| 4/15/10 | 12,000 |
| 1/5/11 | 5,000 |
| 3/30/11 | 5,000 |
| 6/7/11 | 15,000 |
| 7/15/11 | 9,000 |
| 8/8/11 | 13,000 |
| 11/2/11 | 10,000 |
| 4/5/12 | 4,200 |
| 7/3/12 | 68,000 |
| Total | 190,200 |

In his analysis of Doobtubes' gross receipts, Revenue Agent Scott excluded $186,000 of transfers from the Charles Schwab account but apparently failed to take into account the $4,200 transfer of April 5, 2012. We therefore will reduce Doobtubes' gross receipts, as determined by respondent, by $4,200 for 2012. Petitioners have failed to show that respondent's use of the bank deposits method to determine their unreported income from Doobtubes was otherwise inaccurate or unfair.

**[\*24]** B.     Cost of Goods Sold

Respondent disallowed all of Doobtubes' costs of goods sold for 2011 and 2012.[18]  A business' gross income is calculated by subtracting the cost of goods sold from gross receipts or sales.  Sec. 1.61-3(a), Income Tax Regs.  Cost of goods sold is not a deduction from gross income and is not subject to the limitations on deductions in sections 162 and 274.  Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 661 (1987).  Cost of goods sold is the sum of beginning inventory and purchases (and other acquisition or production costs) during the taxable year less ending inventory.  Huffman v. Commissioner, 126 T.C. 322, 324 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008); secs. 1.162-1(a), 1.446-1(a)(4)(i), Income Tax Regs. In computing cost of goods sold, an amount cannot be taken into account any earlier than the taxable year in which economic performance occurs.  Sec. 1.61-3(a), Income Tax Regs.  A taxpayer must retain records sufficient to substantiate the reported cost of goods sold.  Sec. 6001(a); Newman v. Comissioner, T.C. Memo. 2000-345.

_____

[18]Respondent has not challenged the $15,000 of cost of goods sold that petitioners claimed for 2010, and we deem respondent to have conceded this item. As noted, on their 2010 tax return petitioners erroneously added cost of goods sold to Doobtubes' gross receipts instead of subtracting that amount.  We expect this error to be corrected in the Rule 155 computations.

[*25] Although petitioners offered into evidence invoices from the manufacturers of the materials Mr. Chico used to manufacture the doob tubes, they provided no information regarding Doobtubes' beginning and ending inventories for 2011 or 2012. Consequently, they have failed to substantiate Doobtubes' costs of goods sold for these years. See Petzoldt v. Commissioner, 92 T.C. at 698. We sustain respondent's disallowance of Doobtubes' cost of goods sold for 2011 and 2012.

### C. Business Expenses

#### 1. 2010 Tax Year

##### (a) Supplies Expenses

On line 22 of the 2010 Schedule C, petitioners reported supplies expenses for Doobtubes of $56,016. As noted, respondent has conceded $29,835 of these expenses with respect to 2010. Petitioners have failed to substantiate any greater supplies expenses.

##### (b) Other Expenses

On line 27 of the 2010 Schedule C, petitioners reported "Other expenses" of $7,800, described as "CHRIS MILLER TRADEMARK PU". Respondent concedes that by their 2010 agreement with Chris Miller, to pay $10,000 for the "Dube Tubes" trademark, Doobtubes acquired an intangible asset. Respondent contends, however, that under section 197 the cost of this intangible asset must be

[*26] amortized ratably over 15 years.  On brief petitioners have not challenged this contention, and we deem them to have waived any argument to the contrary.  On the basis of the parties' mutual concessions and our review of the record, we conclude and hold that for 2010 petitioners are entitled to deduct $500 of other expenses, representing an amortization deduction under section 197 for this intangible asset.[19]

### 2.    2011 Tax Year

#### (a)    Car and Truck Expenses

Respondent disallowed any deduction for all of Doobtubes' 2011 car and truck expenses.  These expenses are subject to the strict substantiation requirements of section 274(d).  Petitioners provided no travel logs or any other documentary evidence regarding the use of vehicles (i.e., travel destination, dates of travel, distance, or business purpose of each trip).  Indeed, petitioners failed to provide any information as to what type of vehicle might have been used in the business.  Petitioners assert that the credit card statements provided to the Court

---

[19]We compute this amount on the basis of annual amortization of $10,000 over 15 years, which yields $667 per year.  Because the intangible asset was acquired in April 2010, however, the 15-year period begins as of the first day of that month.  See sec. 197(a); sec 1.197-2(f)(1)(i)(A), Income Tax Regs.  Consequently, petitioners' allocable amortization deduction for 2010 is nine-twelfths of $667, or $500.

[*27] substantiate their reported car and truck expenses, but our review of those statements reveals no car- or truck-related charges. Moreover, the credit card statements do not, in and of themselves, corroborate the claimed business purpose of the reported expenses. Petitioners have failed to substantiate car and truck expenses as required by section 274(d).

(b)     Travel Expenses

Respondent disallowed all of Doobtubes' 2011 travel expenses. These expenses are also subject to the strict substantiation requirements of section 274(d). Petitioners again rely on their credit card statements to substantiate the travel expenses. Although the credit card statements show a number of airline tickets purchased by petitioners, they do not demonstrate the business purpose of the travel and therefore do not meet the substantiation requirements of section 274(d).

(c)     Other Expenses

Petitioners claimed deductions for other expenses totaling $14,658, consisting of (1) $2,500 for "CHRIS MILLER TRADEMARK PU"; (2) tradeshows/booth rentals of $7,682; (3) processing fees of $2,318; and (4) cellular telephone expenses of $2,158. Respondent disallowed all these deductions.

[*28] With respect to the Chris Miller Trademark PU, petitioners may amortize $667 for 2011. See supra note 19. With respect to the tradeshow/booth rentals, petitioners provided invoices and receipts substantiating tradeshow/booth rental payments of $6,760. With respect to the processing fees, petitioners have provided no information to substantiate any deduction and so are entitled to none. Petitioners have provided insufficient evidence to substantiate the reported cellular telephone expenses and so are not entitled to the deductions.

In sum, we hold that for 2011 petitioners may deduct $7,427 ($667 plus $6,760) of other expenses.

### 3. 2012 Tax Year

#### (a) Car and Truck Expenses

Respondent disallowed any deduction for all of Doobtubes' 2012 car and truck expenses. Petitioners submitted credit card statements to substantiate these expenses. Our review of the credit card statements reveals no car- and truck-related charges. And, as previously discussed, credit card statements do not meet the heightened substantiation requirements of section 274(d).

#### (b) Travel Expenses

Respondent disallowed any deduction for all of Doobtubes' 2012 travel expenses. Petitioners assert that the credit card statements substantiate these

[*29] expenses.  However, as previously discussed, the credit card statements do not meet the heightened substantiation requirements of section 274(d).

### (c)    Other Expenses

Petitioners reported other expenses of $23,268 although their supporting schedule listed other expenses of only $14,730, consisting of (1) tradeshows/booth rentals of $9,397, (2) processing fees of $1,767, (3) cellular telephone expenses of $2,280, (4) $485 for the replacement of a lost/stolen telephone, and (5) $801 for the replacement of a broken telephone.[20]

With respect to the Chris Miller Trademark PU, for the reasons previously discussed petitioners may amortize $667 for 2012.  See supra note 19.  With respect to the tradeshow/booth rentals, petitioners provided invoices and receipts to substantiate tradeshow/booth rental payments of $160.  With respect to the remaining other expenses, petitioners have provided no information to show how these items relate to Doobtubes and have not otherwise adequately substantiated them.

In sum, we hold that for 2012 petitioners may deduct $827 ($667 plus $160) of other expenses.

---

[20]The record contains no explanation of the $8,538 of other expenses reported in excess of the amounts listed in the supporting schedule; petitioners have not established that they are entitled to deduct the $8,538.

[*30] IV.     <u>Lakewood</u>

A.     <u>Ordinary Dividends</u>

Revenue Agent Scott discovered Lakewood and Mr. Chico's ownership interest in it while he was performing his bank deposits analysis. Petitioners failed to respond to his requests for information regarding Lakewood or to his requests that they file tax returns on the corporation's behalf. On the basis of his detailed bank deposits analysis, Revenue Agent Scott determined that Mr. Chico had received constructive dividends from Lakewood (in the form of direct cash transfers to Mr. Chico or else payments of his personal expenses) of $66,153 for 2010 and $5,136 for 2011.

Sections 301 and 316 govern the characterization, for Federal income tax purposes, of corporate distributions of property to shareholders. If the distributing corporation has sufficient earnings and profits, the distribution is a dividend that the shareholder must include in gross income. Secs. 301(c)(1), 316. If the distribution exceeds the corporation's earnings and profits, the excess generally represents a nontaxable return of capital to the extent of the shareholder's basis in the corporation, and any remaining amount is taxable to the shareholder as a gain from the sale or exchange of property. Sec. 301(c)(2) and (3); <u>Truesdell v. Commissioner</u>, 89 T.C. 1280, 1295-1298 (1987).

[*31] The taxpayer bears the burden of proving that the corporation lacks sufficient earnings and profits to support dividend treatment at the shareholder level. Truesdell v. Commissioner, 89 T.C. at 1295-1296; Fazzio v. Commissioner, T.C. Memo. 1991-130, aff'd, 959 F.2d 630 (6th Cir. 1992); Zalewski v. Commissioner, T.C. Memo. 1988-340; Delgado v. Commissioner, T.C. Memo. 1988-66.

Revenue Agent Scott determined that in 2010 Lakewood had current-year and accumulated earnings and profits of $164,194 and that in 2011 it had accumulated earnings and profits of $54,041. Petitioners produced no evidence concerning Lakewood's earnings and profits for 2010 or 2011 and have not otherwise challenged respondent's determinations of Lakewood's earnings and profits. They have failed to meet their burden of proving that there were insufficient earnings and profits to support respondent's determinations of constructive dividends. See Truesdell v. Commissioner, 89 T.C. at 1295-1296; Pac. Mgmt. Grp. v. Commissioner, T.C. Memo. 2018-131, at *65-*66.

Characterization of a distribution as a dividend does not depend upon a formal dividend declaration. See Boulware v. United States, 552 U.S. 421, 429 (2008); Truesdell v. Commissioner, 89 T.C. at 1295; see also Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), aff'g T.C. Memo. 1965-84.

[*32] Dividends may be formally declared or constructive. A constructive dividend is an economic benefit conferred upon a shareholder by a corporation without expectation of repayment. Truesdell v. Commissioner, 89 T.C. at 1295. "Corporate expenditures constitute constructive dividends only if 1) the expenditures do not give rise to a deduction on behalf of the corporation, and 2) the expenditures create 'economic gain, benefit, or income to the owner-taxpayer.'" P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987) (quoting Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984)), aff'g T.C. Memo. 1984-549; see also Erickson v. Commissioner, 598 F.2d 525, 531 (9th Cir. 1979), aff'g in part, rev'g in part T.C. Memo. 1976-147.

Petitioners contend that respondent has improperly attributed to them dividends that Lakewood purportedly paid to Mr. Bustos in 2010 and 2011. Petitioners assert that because Mr. Chico and Mr. Bustos were each 50% shareholders in Lakewood, any dividend payments made by the corporation should be allocated equally between them. We are not persuaded. Revenue Agent Scott did not allocate Lakewood's distributions on the basis of ownership percentages. Rather, he tracked payments from Lakewood to petitioners' bank accounts to

[*33] arrive at the calculated amounts. Moreover, when the 2011 dividend payments were made, Mr. Chico was Lakewood's sole shareholder.[21]

Petitioners further assert that on their 2010 Form 1040 they correctly reported $48,299 of dividends from Lakewood. They point to line 21 of their 2010 Form 1040, which lists "Other income" of $48,299. In response to the directive at line 21 to "List type and amount", petitioners' Form 1040 states: "SEE STMT". An attached statement indicates in its entirety:

| | |
|---|---|
| AMORTIZATION | (2,701) |
| OTHER INCOME | 51,000 |
| | 48,299 |

Mr. Chico testified that in 2010 Lakewood repaid to him the "initial bank accounts" that he had used to start the corporation, that "we took $1,000 a week, when it could pay us", and that he reported $51,000 of these payments for 2010.[22]

_____

[21]The record is unclear as to the portion of 2011 for which Lakewood operated as a C corporation. Respondent's adjustments appear to presuppose that it operated as a C corporation for some part of 2011, and petitioners have not asserted otherwise. To the contrary, on brief petitioners concede a $2,568 increase in ordinary dividends from Lakewood for 2011 but appear to contend that the remaining $2,568 should be allocated to Mr. Bustos. For reasons previously explained, we reject this contention.

[22]The record provides no explanation of the $2,701 amortization deduction indicated on the statement attached to petitioners' 2010 Form 1040.

**[*34]** This testimony finds some support in Revenue Agent Scott's workpapers, which show periodic deposits to petitioners' checking account of $1,000 checks from Lakewood throughout 2010.[23] On the basis of all the evidence in the record we have found that on their 2010 Form 1040 petitioners reported $48,299 of dividends from Lakewood as other income.

Petitioners have shown no other error in respondent's determination of their unreported constructive dividends from Lakewood for 2010 or 2011. Accordingly, we hold that petitioners have unreported constructive dividends from Lakewood of $17,854 ($66,153 as determined by respondent less the $48,299 reported as other income on petitioners' 2010 Form 1040) for 2010 and $5,136 for 2011 (as determined by respondent).

---

[23]The record indicates that Revenue Agent Scott might have inadvertently understated the amount of petitioners' 2010 constructive dividends by mistakenly subtracting some of these payments. His bank deposits analysis indicated that in 2010 Lakewood made distributions to Mr. Chico totaling $104,875. In calculating the amount of constructive dividends, however, Revenue Agent Scott subtracted $38,722, representing amounts that he believed to represent returns of Mr. Chico's contributions to capital. At trial Revenue Agent Scott testified that he had made a mistake in allowing this credit for returns of contributions to capital and that instead he should have treated these amounts as adjustments to Mr. Chico's stock basis. He testified that if the constructive dividends were to be recalculated, the correct amount should be $104,875. Respondent has not sought any increased deficiency in this regard.

**[*35]** B.     <u>S Corporation Passthrough Income</u>

In January 2011 Mr. Chico filed an S corporation election for Lakewood, effective January 1, 2011. An eligible small business corporation that elects S corporation status is generally exempt from corporate income tax. <u>See</u> sec. 1363(a). Instead, the S corporation's shareholders must report pro rata shares of the S corporation's taxable income, losses, deductions, and credits. Sec. 1366(a)(1)(A); sec. 1.1366-1(a), Income Tax Regs.

Respondent determined that during 2011 Lakewood had $52,066 in taxable receipts. On the basis of the limited information available to him, respondent further determined that during 2011 Mr. Chico was the corporation's sole shareholder and that petitioners were thereby responsible for the entirety of the corporation's 2011 income.

At trial Mr. Chico asserted that he was not Lakewood's sole shareholder during 2011. Petitioners have offered no other evidence, however, to support this assertion. Nor have they explained why Mr. Bustos' name was crossed out on Corporate Authorization Resolution No. 396169. In any event, the parties have stipulated that Mr. Chico "was a 100% shareholder of LPRC [Lakewood] in 2011." On the basis of the preponderance of evidence in the record we conclude

**[\*36]** that Mr. Chico was the sole shareholder of Lakewood in 2011, and we sustain respondent's determination of passthrough income to petitioners.

## V. Petitioners' Rental of Their Property

### A. Unreported Income

Respondent determined that petitioners underreported their rental income by $156 for 2010, $4,971 for 2011, and $4,100 for 2012. Petitioners failed to respond to Revenue Agent Scott's request for information or otherwise to cooperate with his examination. He was therefore justified in reconstructing petitioners' rental income through the bank deposits method. Petitioners also failed to present any documentation to the Court to challenge respondent's determinations in this regard.

At trial Mr. Chico asserted that the difference between petitioners' reported rental income and respondent's determination was attributable to the tenants' payments toward shared utilities expenses. Apart from this vague testimony, however, petitioners have presented no evidence to substantiate the amounts of any such shared expenses or to show whether the rental agreements included or excluded utilities in the agreed-upon rental amounts. Since petitioners produced no evidence to support Mr. Chico's assertions, we hold against them on this issue.

**[*37]** B.    <u>Depreciation</u>

On Schedule E for each of the years 2011 and 2012 petitioners claimed depreciation deductions of $22,438.[24]  In the notice of deficiency respondent disallowed these deductions in full.  In this proceeding, respondent has conceded that petitioners are entitled to a depreciation deduction of $12,007 for each of the years 2011 and 2012.  For the reasons explained below, petitioners have not shown that they are entitled to any greater depreciation deductions than respondent has conceded.

To substantiate entitlement to a depreciation deduction, a taxpayer must establish the property's depreciable basis, by showing the cost of the property, its useful life, and the previously allowable depreciation.  <u>Cluck v. Commissioner</u>, 105 T.C. 324, 337 (1995).  Land is not depreciable.  Sec. 1.167(a)-2, Income Tax Regs.

The parties agree that petitioners purchased the marital home in 2005 for $935,000, of which $280,500 was allocated to land and $654,500 to improvements in the 2005 county supplemental property tax statement.  On the basis of this evidence, respondent's concession treats $654,500 as petitioners' depreciable basis in the property.  Mr. Chico testified that petitioners made improvements to

---

[24]Petitioners claimed no depreciation deductions for 2010.

**[\*38]** the property including landscaping and upgrading the bathroom and kitchen in the rental portion of the property, but he provided no specifics regarding when the improvements were made or their cost. Other than this vague and general testimony, petitioners have presented no evidence or argument to support any higher amount of depreciable basis. We conclude that respondent has reasonably relied upon the $654,500 assessed value as the property's depreciable basis for 2011 and 2012.

We have found that 50.45% of petitioners' marital property was rented. The parties agree that the applicable recovery period for the property is 27.5 years. See sec. 168(c). Dividing the depreciable basis of $654,500 by 27.5 yields $23,800. Multiplying that quotient by 50.45% results in a product of $12,007, which is the amount respondent has conceded as a depreciation deduction. In accordance with respondent's concession, we hold that petitioners are entitled to a Schedule E depreciation deduction of $12,007 for each of the years 2011 and 2012.

VI.   Net Operating Loss

Section 172(a) allows a deduction for a net operating loss for the taxable year in an amount equal to the sum of (1) the net operating loss carryovers to that year and (2) the net operating loss carrybacks to that year. A net operating loss is

[*39] defined as the excess of deductions allowed by chapter 1 of the Code over gross income, subject to certain modifications in section 172(d). Sec. 172(c). A taxpayer who claims a net operating loss deduction bears the burden of establishing both the existence of the net operating loss and the amount that may be carried over to the year involved. Keith v. Commissioner, 115 T.C. 605, 621 (2000); Scharringhausen v. Commissioner, T.C. Memo. 2012-350. As part of that burden, the taxpayer must file with his or her return a concise statement setting forth the amount of the net operating loss deduction claimed and all material and pertinent facts, including a detailed schedule showing the computation of the net operating loss deduction. Sec. 1.172-1(c), Income Tax Regs.

On line 21 of their 2012 Federal income tax return, petitioners entered "NOL" and "($11,693)". Petitioners failed, however, to attach a statement to the return as required by section 1.172-1(c), Income Tax Regs. At trial Mr. Chico testified that he had determined that petitioners were entitled to a net operating loss carryforward because "[w]e had business losses and carry forwards, for every year, beginning with the year that the stock market crashed with $40,000. And then the NOL was knocked out, I guess during adjustment, but I am entitled to that NOL carryover. Business losses." On brief petitioners contend that this testimony proves their entitlement to the net operating loss deduction. We disagree.

**[*40]** Petitioners have provided no probative evidence regarding the original purported loss, including its amount and the year incurred. Consequently, we sustain respondent's determination disallowing the net operating loss deduction.

VII.  Civil Fraud Penalty

Respondent asserts that for each year at issue Mr. Chico committed fraud in preparing and filing his Federal income tax return. Consequently, respondent argues, he is liable for the fraud penalty under section 6663.

A.  General Principles

If any part of any underpayment of tax required to be shown on a return is due to fraud, there is an addition to tax of 75% of the portion of the underpayment that is attributable to fraud. See sec. 6663(a). If the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as due to fraud unless the taxpayer can establish by a preponderance of the evidence that portion of the underpayment which is not attributable to fraud. Sec. 6663(b).

Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing. See Petzoldt v. Commissioner, 92 T.C. at 698. Fraud is never imputed or presumed. Parks v. Commissioner, 94 T.C. 654, 660 (1990). The existence of fraud is a question of fact to be resolved upon consideration of the entire record.

[*41] Id.; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978).

To establish fraud, the Commissioner must prove for each year that: (1) an underpayment of tax exists and (2) the taxpayer had fraudulent intent, i.e., that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. at 660-661; see Clayton v. Commissioner, 102 T.C. at 647. The Commissioner must prove these elements by clear and convincing evidence. Sec. 7454(a); see Petzoldt v. Commissioner, 92 T.C at 699. Because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. The taxpayer's entire course of conduct may be examined to establish the requisite intent. Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969); Romer v. Commissioner, T.C. Memo. 2001-168.

B.    Supervisory Approval

As a threshold matter, respondent must show that he complied with section 6751(b)(1), which requires that certain penalties be personally approved in writing

[*42] by the immediate supervisor of the individual making the determination. See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).  Respondent has satisfied his burden of production with regard to the supervisory approval requirement of section 6751(b) (and petitioners do not contend otherwise).

C.    Underpayment of Income Tax

The Commissioner must prove an underpayment of tax in support of the fraud penalty.  To sustain his burden, the Commissioner need not prove the precise amount of the deficiency attributable to fraud, but only that a part of the deficiency is attributable to fraud.  Estate of Beck v. Commissioner, 56 T.C. 297, 363-364 (1971).  When the allegations of fraud are intertwined with unreported income and indirectly reconstructed income, as they are in this case, the Commissioner may prove an underpayment by proving a likely source of the unreported income.  Id. at 361.  As stated in Said v. Commissioner, T.C. Memo. 2003-148, 85 T.C.M. (CCH) 1353, 1356 (2003), aff'd, 112 F. App'x 608 (9th Cir. 2004):

> An underpayment will exist where unreported gross receipts are not exceeded by costs of goods sold and deductible expenses.  In establishing the underpayment, the Commissioner may not simply rely on the taxpayer's failure to prove error in the deficiency determination.  DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Otsuki v. Commissioner, 53 T.C. 96, 106

[*43] (1969).  However, upon clear proof of unreported receipts, even in a criminal case, the burden of coming forward with offsetting costs or expenses generally shifts to the taxpayer.  See Siravo v. United States, 377 F.2d 469, 473-474 (1st Cir. 1967); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956).

As previously discussed, respondent has shown sources of unreported income to petitioners from Doobtubes, Lakewood, and petitioners' rental activity.  Petitioners have failed to show that the receipts were offset by deductible costs or expenses.  As a result, it is established by clear and convincing evidence that petitioners had an underpayment of tax for each year at issue.

D.    Fraudulent Intent

Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including the consistent understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of income or assets, and failure to cooperate with tax authorities.  See Estate of Trompeter v. Commissioner, 279 F.3d 767, 773 (9th Cir. 2002), vacating and remanding 111 T.C. 57 (1998); Bradford v. Commissioner, 796 F.2d at 307-308.  Although no single factor is necessarily sufficient to establish fraud, a combination of several factors is persuasive circumstantial evidence of fraud.  Bradford v. Commissioner, 796 F.2d at 307-308.  An intent to mislead may be inferred from a pattern of conduct, see

**[\*44]** <u>Spies v. Commissioner</u>, 317 U.S. at 499 ("[W]e would think affirmative willful attempt may be inferred from conduct[.]"), or from a taxpayer's entire course of conduct, <u>see</u> <u>Stone v. Commissioner</u>, 56 T.C. at 224.  Although mere underreporting of gross receipts or income is insufficient to support a finding of fraud, "repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud."  <u>Furnish v. Commissioner</u>, 262 F.2d 727, 728-729 (9th Cir. 1958), <u>aff'g in part and remanding</u> 29 T.C. 279 (1957).  A taxpayer's background and the context of the events in question may be considered circumstantial evidence of fraud.  <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 211 (1992); <u>see</u> <u>Spies</u>, 317 U.S. at 497; <u>United States v. Murdock</u>, 290 U.S. 389, 395 (1933).

The facts in this case include many badges of fraud.  Over the three years at issue petitioners consistently and substantially understated their income.  In particular, over this period they understated their gross receipts from Doobtubes by more than $180,000.  Petitioners have offered no explanation for understating these gross receipts other than to contend that these amounts represented an inheritance that Mr. Chico received immediately before the years at issue and gradually transferred to Doobtubes from petitioners' Charles Schwab account.  As

[*45] explained above, however, the evidence shows that Revenue Agent Scott actually gave petitioners credit for all but $4,200 of the amounts transferred from their Charles Schwab account, excluding from his reconstruction of Doobtubes' gross receipts the remaining $186,000 of Charles Schwab transfers. In the light of this evidence, petitioners' explanation is implausible.

Petitioners' records were inadequate. At trial Mr. Chico stated that he used QuickBooks to maintain the accounts of his businesses. Yet despite referring to them repeatedly, he never provided these records to the Court or to the IRS.

Despite being a 50% owner and Lakewood's chief financial officer in 2010 as well as the corporation's sole shareholder in 2011, Mr. Chico failed to file corporate tax returns for Lakewood for either year. See Franke v. Commissioner, T.C. Memo. 2011-10, 101 T.C.M (CCH) 1029, 1031 (2011) (treating taxpayer's failure to file tax returns for his partnership as circumstantial evidence of fraud). And although we have found that petitioners reported a portion of the Lakewood dividends on their 2010 Form 1040 as other income, they did so in such a manner as to avoid disclosing the true nature and source of the dividends while omitting significant amounts of constructive dividends. As the Court of Appeals for the Ninth Circuit has observed: "The fact that a taxpayer provides the IRS with a hint about omitted income does not automatically preclude a court from finding that

**[\*46]** the taxpayer acted with an intent to evade taxes. To hold otherwise would encourage unscrupulous taxpayers and their agents to make partial or opaque disclosures designed to avoid taxation without risking fraud penalties." Maciel v. Commissioner, 489 F.3d 1018, 1027 (9th Cir. 2007), aff'g in part, rev'g in part T.C. Memo. 2004-28.

Petitioners were uncooperative during Revenue Agent Scott's examination. They failed to provide documentation or respond to questions until respondent commenced a summons enforcement action. Petitioners assert--and respondent does not deny--that at the February 12, 2016, meeting with Revenue Agent Scott and Ms. Romey (after the commencement of the summons enforcement action), petitioners were informed that a criminal investigation had not been ruled out. They argue that it was this possibility of criminal prosecution that explains their failure to respond to respondent's requests for information. The record shows, however, that petitioners exhibited a lack of cooperation from the very beginning of the IRS examination, long before the February 12, 2016, meeting (and long before there was any hint of criminal prosecution).

Mr. Chico is a tax professional, having operated Ray's Tax Service for many years and having been registered with CTEC from 2003 through 2016 as a certified tax preparer. To maintain that certification, he completed continuing

[*47] education courses regarding corporate and business taxation. During the years at issue Mr. Chico prepared about 40 income tax returns each year; previously, at his busiest point, he had prepared about 73 returns a year. Moreover, Mr. Chico filed an S corporation election for Lakewood, effective January 1, 2011, thereby demonstrating familiarity with corporate filing procedures. Mr. Chico's business experience and knowledge of the tax laws is circumstantial evidence that he was aware of his tax-reporting obligations and that in consistently underreporting his income, he did so with fraudulent intent. See Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), aff'g T.C. Memo. 1982-603; Romer v. Commissioner, T.C. Memo. 2001-168.

Respondent has proven by clear and convincing evidence that for each year at issue Mr. Chico had an underpayment of tax due to fraudulent intent. Petitioners have not proven that any specific portion of any underpayment of tax was not attributable to fraud. See sec. 6663(b). Consequently, we hold that for each year at issue Mr. Chico is liable for the section 6663 fraud penalty based upon the underpayments to be determined in the Rule 155 computations.

**[*48]** VIII.  <u>Timeliness of the Notice of Deficiency With Respect to 2010 and 2011</u>

Petitioners timely filed their 2010 and 2011 Federal income tax returns on September 21, 2011, and April 15, 2012, respectively.  Respondent issued the notice of deficiency on July 25, 2016.  As respondent has conceded, the section 6501(a) three-year period of limitation for 2010 and 2011 expired before the issuance of the notice of deficiency.  Section 6501(c)(1), however, provides that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time."  Thus, if fraud is established, the notice of deficiency will be valid.

The Commissioner's burden of proof with respect to the section 6501(c)(1) fraud exception to the general three-year period of limitations is the same as for the section 6663 civil fraud penalty.  <u>Neely v. Commissioner</u>, 116 T.C. 79, 85-86 (2001); <u>Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner</u>, 114 T.C. 533, 548 (2000).  As we have already discussed, respondent has established by clear and convincing evidence that for each year at issue some portion of petitioners' underpayment of tax was attributable to fraud.  Hence the section

**[*49]** 6501(c)(1) fraud exception to the general three-year period of limitations applies for both 2010 and 2011.

IX.    Accuracy-Related Penalty

Respondent has not asserted fraud penalties against Ms. Chico but alleges that she is liable for the section 6662(a) accuracy-related penalty for each year at issue.

The accuracy-related penalty cannot be imposed on one spouse where the other spouse is liable for the fraud penalty, as this would lead to impermissible stacking of penalties.  See sec. 6662(b); Said v. Commissioner, T.C. Memo. 2003-148.  Because Mr. Chico is liable for the fraud penalty for each underpayment, Ms. Chico is not liable for the accuracy-related penalties.

To reflect the foregoing and the parties' concessions,

Decision will be entered under

Rule 155.